UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN FARROW, et al.,

      Plaintiffs,

    v.

CONTRA COSTA COUNTY,

      Defendant.

Case No. 12-cv-06495-JCS

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY**

Re: Dkt. Nos. 125, 126, 128

## I.    INTRODUCTION

Plaintiffs John Farrow and Jerome Wade brought this putative class action asserting a number of claims based on the alleged failure of Defendant Contra Costa County (the "County") to provide appointed counsel at Plaintiffs' first court appearances, or within a reasonable time thereafter, in criminal proceedings in state court. After multiple motions to dismiss, an appeal to the Ninth Circuit, and remand to this Court, Plaintiffs' remaining claims are for failure to provide counsel as required by the Sixth Amendment within a reasonable time after the right attached, and for a writ of mandamus to enforce Contra Costa Public Defender Robin Lipetzky's obligations under section 27706 of the California Government Code. In accordance with the case schedule set by the Court, the parties now bring cross motions for summary judgment on Plaintiffs' individual claims before the question of class certification has been addressed, and the County moves to exclude the opinions of Plaintiffs' expert witness. The Court held a hearing on January 19, 2018. For the reasons discussed below, the County's motion to exclude expert testimony is GRANTED IN PART, Plaintiffs' motion for summary judgment is DENIED, the County's motion for summary judgment is GRANTED as to Plaintiffs' Sixth Amendment claim, and Plaintiffs' state

law claim is DISMISSED for lack of jurisdiction.[1]

## II.     BACKGROUND

### A.     Procedural History and Allegations

#### 1.  May 2013 Order

Plaintiffs' original complaint included six claims against Robin Lipetzky, the Contra Costa County Public Defender: (1) violation of Plaintiffs' right to counsel under the Sixth Amendment; (2) violation of Plaintiffs' right to a speedy trial under substantive due process protections of the Fourteenth Amendment; (3) violation of Plaintiffs' right to a speedy trial under procedural due process protections of the Fourteenth Amendment; (4) violation of Plaintiffs' procedural due process rights under the Fourteenth Amendment with respect to the timing of Plaintiffs' bail hearings; (5) violation of California Civil Code sections 52 and 52.1; and (6) a claim for a writ of mandate to enforce California Government Code section 27706.  *See* Order Granting Def.'s Mot. to Dismiss Compl. ("May 2013 Order," dkt. 47) at 5−6.[2]

The Court held that Plaintiffs' right to counsel attached at their first court appearances, but that neither that appearance nor the waiting period before the second appearance was a "critical stage" at which counsel was required.  *Id.* at 14−20.  The Court also held that the delay in appointing counsel between the time of attachment and the second appearance—which, unlike the first, was a critical stage—did not violate the Supreme Court's instruction that counsel must be provided within a reasonable time after attachment, because the delay was shorter than in other district court cases that found no violation, and because Plaintiffs did not adequately allege that they were prejudiced by the delay.  *Id.* at 20−22 (citing *Rothgery v. Gillespie County*, 554 U.S. 191 (2008)).  The Court therefore dismissed Plaintiffs' Sixth Amendment claim with leave to amend. *Id.*  The Court also dismissed Plaintiffs' other federal claims with leave to amend, for reasons that are not relevant to the present motion because Plaintiffs did not renew those claims.  *Id.* at 23−31.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).
[2] *Farrow v. Lipetzky*, No. 12-cv-06495-JCS, 2013 WL 1915700 (N.D. Cal. May 8, 2013). Citations herein to this Court's previous orders refer to page numbers of the versions filed in the Court's ECF docket.

With no federal claims remaining, the Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Id.* at 31−32.

### 2. August 2013 Order

After the Court dismissed the initial complaint, Plaintiffs amended their complaint twice, and Lipetzky moved to dismiss the second amended complaint. *See generally* Order Granting Def.'s Mot. to Dismiss 2d Am. Compl. (dkt. 69).[3] The Court granted that motion and dismissed all claims, although it allowed Wade leave to amend his Sixth Amendment claim. *Id.* at 1−2.

With respect to the Sixth Amendment claim, the Court reaffirmed its previous holdings that neither the first appearance nor the waiting period before the second appearance was a critical stage at which Plaintiffs were entitled to counsel, but the second appearance was a critical stage. *Id.* at 22−26 (citing *Lopez-Valenzuela v. County of Maricopa*, 719 F.3d 1054 (9th Cir. 2013), *subsequently superseded sub nom. Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014) (en banc)[4]). Turning to the question of whether the challenged policy failed to provide counsel within a reasonable time after attachment of the right, the Court held that although Plaintiffs added allegations regarding the effect of the delay, the allegations did not sufficiently identify any actual prejudice that Plaintiffs suffered as a result. *Id.* at 26−27. Because Plaintiffs came closer to plausibly alleging prejudice to Wade than to Farrow, the Court dismissed Wade's Sixth Amendment claim with leave to further amend but dismissed Farrow's claim with prejudice.

The Court dismissed Plaintiffs' remaining federal claims with prejudice, for reasons that are not relevant to the present motion, and again declined to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Id.* at 28−35. Wade declined to further amend his Sixth Amendment claim, and Plaintiffs instead appealed to the Ninth Circuit.

---

[3] *Farrow v. Lipetzky*, No. 12-cv-06495-JCS, 2013 WL 4042276 (N.D. Cal. Aug. 7, 2013), *rev'd in part*, 637 F. App'x 986 (9th Cir. 2016).

[4] The initial Ninth Circuit panel to hear *Lopez-Valenzuela* affirmed the district court's grant of summary judgment for the defendants on claims under multiple constitutional theories. *See generally Lopez-Valenzuela v. County of Maricopa*, 719 F.3d 1054. This Court's August 2013 order relied on that panel's Sixth Amendment holding. Later, an en banc panel reached a different outcome, reversing the holding as to substantive due process and finding the Arizona laws at issue facially invalid on that basis, but declined to address the plaintiffs' Sixth Amendment claims. *See Lopez-Valenzuela v. Arpaio*, 770 F.3d at 791–92.

United States District Court
Northern District of California

### 3. Ninth Circuit Decision and Denial of Certiorari

The Ninth Circuit affirmed this Court's dismissal of Plaintiffs' due process and equal protection claims. *Farrow v. Lipetzky*, 637 F. App'x 986, 987−88 (9th Cir.) (dkt. 81), *cert. denied*, 137 S. Ct. 82 (2016). As for Plaintiffs' Sixth Amendment claims, the panel affirmed this Court's conclusion that, on the facts alleged, Plaintiffs' first court appearance was not a critical stage that required the presence of counsel. *Id.* at 988. The panel held that this Court erred, however, in its analysis of whether counsel was appointed within a reasonable time after attachment of the right, and remanded for consideration of that issue under the correct legal standard:

> The remaining question is whether Lipetzky appointed counsel within a "reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Rothgery,* 554 U.S. at 212. In other words, how soon after the Sixth Amendment right attaches must counsel be appointed, and at what point does delay become constitutionally significant? Instead of addressing whether the delay in appointing counsel was unreasonable, the district court considered only whether the delay "impacted [plaintiff's] representation at subsequent critical stages of his proceedings." By framing the question in that way, the district court erroneously required the plaintiffs to allege actual prejudice. *See United States v. Wade,* 388 U.S. 218, 225, 236–37 (1967) (finding a Sixth Amendment violation based on the "grave potential for prejudice"); *Hamilton v. Alabama,* 368 U.S. 52, 54 (1961) (finding a Sixth Amendment violation where the absence of counsel "may affect the whole trial"). We therefore remand for the district court to consider whether appointing counsel five to thirteen days and "sometimes longer" after the right attaches complies with the "reasonable time" requirement articulated in *Rothgery.*

*Id.* at 988−89 (alteration in original). The panel also directed this Court to reconsider whether supplemental jurisdiction over Plaintiffs' state law claims is appropriate in light of the Court's reconsideration of the Sixth Amendment claim. *Id.* at 989. The Supreme Court denied Plaintiffs' petition for certiorari on October 3, 2016. *See* dkt. 102.

### 4. Third Amended Complaint and Facts Subject to Judicial Notice

Following remand to this Court, Plaintiffs filed their operative third amended complaint, alleging that Lipetzky implemented a written policy that "arbitrarily withheld legal representation to indigent, in-custody criminal defendants for a period of 5 to 13 days after their initial Court appearance." 3d Am. Compl. ("TAC," dkt. 91) ¶ 1. Under that policy, Plaintiffs alleged that a

defendant would not receive counsel at the defendant's first court appearance, but if a defendant requested counsel at that appearance and could not afford to pay, the court would set bail, refer the defendant to the public defender, and continue the case for a "further arraignment" several days later. *See id.* ¶¶ 1–2, 4, 21, 27, 36.

Plaintiffs alleged that Farrow was arrested on August 30, 2011, based on allegations that he had assaulted his domestic partner. *Id.* ¶¶ 25, 31. He first appeared in court on September 2, 2011, at which time the judge asked if he could afford counsel and would like the court to appoint counsel. *Id.* ¶¶ 26–27. Farrow replied that he could not afford counsel and would like appointed counsel, and the judge "set bail, 'referred the matter to the Public Defender,' and continued the matter to September 15, 2011 for 'further arraignment.'" *Id.* ¶ 27. The judge also asked the probation department to prepare a bail study, which according to Plaintiffs was prepared during the period between the two court appearances and included only information unfavorable to Farrow because, without counsel, there was no way for him to provide mitigating information such as his ties to the community or employment status. *Id.* ¶ 28. The judge did not advise Farrow of his right to enter a plea at the first appearance, and Farrow remained in jail for the next thirteen days. *Id.* ¶ 27.

Plaintiffs alleged that Farrow was appointed counsel and entered a plea at his second appearance on September 15, 2011, which was sixteen days after his arrest and thirteen days after his first appearance. *Id.* ¶ 29. According to Plaintiffs, the delay in Farrow obtaining counsel "might have" contributed to his investigator's failure to locate witnesses whose testimony could have implicated the credibility of the complaining witness (Farrow's domestic partner) and thus "would have had an enormous impact on plea negotiations and may have resulted in acquittal had the matter gone to trial." *Id.* ¶ 31. Farrow pled guilty to one count against him on December 1, 2011. Def.'s Req. for Judicial Notice ("RJN," dkt. 94) Ex. A.

Plaintiffs alleged that Wade, then seventeen years old, was arrested at his high school on November 8, 2011 for his alleged involvement in a convenience store robbery. TAC ¶¶ 32, 43.

Wade first appeared without counsel on November 14, 2011. *Id.* ¶ 33.[5] A county prosecutor also appeared in court that day, which Plaintiffs alleged made the appearance "an adversarial encounter." *Id.* ¶ 35. The judge set bail and asked Wade whether he could afford counsel and whether he would like counsel appointed. *Id.* ¶ 36. Wade responded that he could not afford counsel and would like appointed counsel, and the judge "'referred the matter to the Public Defender,' and continued the matter to November 21 for 'further arraignment.'" *Id.* Plaintiffs alleged that the judge did not advise Wade of "his right to enter a plea, his right to bail, his right to prompt arraignment or his right to a speedy preliminary hearing and trial." *Id.* As in the case of Farrow, the judge also referred the matter to the probation department for a bail study, which, according to Plaintiffs, did not include information favorable to Wade because he did not have counsel. *Id.* ¶ 37. Wade remained in jail for seven days. *Id.* ¶ 36.

According to Plaintiffs' allegations, the police and district attorney continued their investigation of Wade's case during the period between his first and second court appearances. *Id.* ¶ 39. On November 18, 2011, the district attorney filed an amended complaint adding new charges and significantly increasing Wade's exposure. *Id.* ¶ 40. Plaintiffs alleged that the district attorney was able to do so without leave of the court because Wade had not yet entered a plea. *Id.*

Wade was appointed counsel at his second court appearance on November 21, 2011. *Id.* ¶ 41. Later, his investigator interviewed his high school principal, who had been present when the police interrogated Wade. *Id.* ¶ 42. Plaintiffs alleged that the principal could not remember when Wade was given *Miranda* warnings or whether he had been wearing a sweatshirt that connected him to the robbery, and that she "likely" would have remembered what Wade was wearing if she had been interviewed sooner. *Id.* ¶¶ 42, 43. Plaintiffs also suggested (but did not specifically allege) that the principal's memory of the *Miranda* warnings would have been clearer during an earlier interview. *See id.* Wade pled guilty to three counts on December 6, 2012. RJN Ex. B.

The Third Amended Complaint included three claims: (1) a claim under 42 U.S.C. § 1983 for violation of Plaintiffs' Sixth Amendment right to counsel, TAC ¶¶ 56–58; (2) a claim under

---

[5] Plaintiffs alleged that Wade was held illegally for four days before his first appearance, but did not bring a claim based on that pre-appearance detention. *See* TAC ¶ 34.

the Bane Act, sections 52 and 52.1 of the California Civil Code, for violation of Plaintiffs' civil rights, TAC ¶¶ 59−60; and (3) and a claim under sections 1085 and 1086 of the California Code of Civil Procedure for a writ of mandate to enforce section 27706 of the California Government Code, which requires public defenders to represent criminal defendants "at all stages of the proceedings," TAC ¶¶ 61−63. Plaintiffs characterized their claims as "a facial challenge to the constitutionality of Defendant's written policy of arbitrarily withholding counsel for an unreasonable period of time" on behalf of all persons who "were subjected to the deprivation of counsel at their first court appearance and were forced to continue their cases for 5 days or more for appointment of counsel, pursuant to the Public Defender's written Policy," from December 21, 2010 through the resolution of this action. *Id.* ¶¶ 45−48.

### 5. April 2017 Order and Substitution of Defendant

Lipetzky again moved to dismiss, and the Court granted that motion in part. Addressing an argument that Lipetzky raised for the first time after remand from the Ninth Circuit, the Court held that *Heck v. Humphrey*, 512 U.S. 477 (1994), did not bar Plaintiffs' Sixth Amendment claim in its entirety because a Sixth Amendment violation for failure to appoint counsel within a reasonable time after attachment (as discussed in *Rothgery*) "would not *necessarily* imply the invalidity of Plaintiffs' convictions in state court." Order Regarding Mot. to Dismiss 3d Am. Compl. ("Apr. 2017 Order," dkt. 107) at 25.[6] The Court rejected Lipetzky's argument that Plaintiffs' claim for unreasonably delayed appointment of counsel must be evaluated under the ineffective assistance standards set forth in either *Strickland v. Washington*, 466 U.S. 668 (1984), or *United States v. Cronic*, 466 U.S. 648 (1984), both of which would require per se reversal of Plaintiffs' convictions and would therefore be barred by *Heck*, because the Court determined that those cases' focus on prejudice was inconsistent with the Ninth Circuit's instructions that Plaintiffs need not show prejudice here. Apr. 2017 Order at 16–17, 24–25 ("The Court is not persuaded by Lipetzky's argument that the Ninth Circuit has asked this Court to analyze Plaintiffs' claims in 'the *Strickland/Cronic* framework.'" (quoting Lipetzky's reply brief)). The Court held that *Heck* did,

---

[6] *Farrow v. Lipetzky*, No. 12-cv-06495-JCS, 2017 WL 1540637 (N.D. Cal. Apr. 28, 2017).

however, bar Plaintiffs' Sixth Amendment claim to the extent that it was based on a theory that they were denied counsel at a "critical stage" of a criminal prosecution, because such a deprivation—at least for the particular stage at issue—would be grounds for per se reversal of Plaintiffs' convictions. *Id.* at 22–23. The Court also held that even with respect to the unreasonable delay claim, *Heck* dictates that Plaintiffs' "'compensable injury . . . does *not* encompass the "injury" of being convicted [or] imprisoned.'" *Id.* at 27–28 (quoting *Heck*, 512 U.S. at 487 n.7) (alterations in original).

Having held that Plaintiffs' claim for delayed appointment of counsel survived *Heck*, the Court turned to what standards should apply to evaluate that claim, and whether Plaintiffs' complaint plausibly stated such a claim. *Id.* at 25–27. With the exception of one Middle District of Louisiana case that required a showing of prejudice inconsistent with the Ninth Circuit's holding on appeal here, the Court found no authority articulating such a standard. *Id.* at 26. The Court therefore held "for the purpose of the [motion to dismiss] that the reasonableness of a delay in appointing counsel after attachment depends on the totality of the circumstances, including the time needed to prepare for an upcoming critical stage—but not limited to that factor." *Id.* at 27. The Court held Plaintiffs' allegations sufficient to state such a claim, which "does not lend itself to resolution on the pleadings." *Id.*

Because at least one aspect of Plaintiffs' federal Sixth Amendment claim survived the motion to dismiss, the Court had supplemental jurisdiction over the state law claims, and examined those as well. *Id.* at 28–32. The Court dismissed Plaintiffs' Bane Act claim with prejudice for failure to establish that Plaintiffs had a right to enter pleas at their first court appearances, and for failure to allege coercion. *Id.* at 28–30. The Court allowed Plaintiffs' claim under Government Code section 27706 to go forward, noting that the public defender's obligation to represent indigent defendants at "all stages of the proceedings" is broader than the "critical stages" at which counsel is required under the Sixth Amendment, and that the obligation is triggered not only by appointment by the court, but also by a defendant's request for representation. *Id.* at 30–31. The Court did "not decide at [that] time whether section 27706 requires a public defender standing by at a defendant's first court appearance to provide

representation immediately if requested, or whether the statute implicitly allows the public defender a reasonable period of time to begin representation after request by an indigent defendant or appointment by the court." *Id.* at 31–32.

After the Court issued its decision on the motion to dismiss the third amended complaint, the parties stipulated to substitute the County for Lipetzky as the defendant in this action. *See* Stip. (dkt. 115); Order on Stip. (dkt. 116).

## B. Evidentiary Record

### 1. 1984 Letter

In a letter dated August 27, 1984, David Coleman, then the supervising attorney of the Richmond branch of the County's Public Defender's Office, wrote to a judge of the Bay Municipal Court in Richmond, California "to clarify and memorialize our understanding of how the client referral process will operate between the arraignment department of your court and our office." Martin Decl. (dkt. 125-1) Ex. 1 at 008.[7] The letter stated that when an in-custody defendant requested referral to the Public Defender's Office, a courtroom clerk would provide a referral form and copy of the complaint to the Public Defender's Office no later than 5:00 PM the same day. *Id.* at 010. An attorney would at some point thereafter interview the defendant at the County's detention facility in Martinez, California, and would be prepared to appear with the defendant and enter a plea "on the afternoon of the <u>third court day</u> following the date of the referral." *Id.* The letter acknowledged that the probation department might require more than three days for a bail study, and that the arraignment might therefore take place more than three days after the defendant requested referral, but the letter stated that an attorney from the Public Defender's Office "will appear on any date such a coordinated appearance for a plea and bail study be scheduled, as long as it is no sooner than three court days away." *Id.* The letter went on

---

[7] Several of Plaintiffs' exhibits include witness depositions and related documents as a single exhibit, with the documents, or portions thereof, inserted throughout the transcript. This order cites to non-transcript documents using Plaintiffs' three-digit Bates numbers. Citations to deposition testimony are identified as such and use the Bates numbers as well as the page and line numbers from the deposition transcripts, with a comma separating Bates citations from transcript pagination. In some exhibits, excerpts of documents and deposition transcripts are not presented in order. Plaintiffs are discouraged from using this format of consolidated, out-of-order exhibits in future filings.

to state that the same schedule would apply in multiple defendant cases where one or more attorneys would be appointed from the Bar Association Conflicts Panel, and that in those cases the Public Defender's Office would provide "provisional" notice of a conflict to the panel by noon of the court day following referral, although a final determination of financial eligibility would usually not be completed at the time of provisional notice. *Id.* at 010–11.

Robin Lipetzky, the current public defender, testified that she had no independent knowledge of the 1984 letter and that it appeared to refer only to proceedings in the Richmond courthouse. Martin Decl. Ex. 1 (Lipetzky Dep.) at 007, 20:16–25.

### 2. More Recent Practices of the Public Defender's Office and Other Testimony of Robin Lipetzky

Lipetzky testified regarding the Public Defender's Office's practices regarding representation at indigent misdemeanor and felony defendants' arraignments, including the older policy of bifurcated arraignments that Plaintiffs in this case experienced, a pilot program for providing representation at some first appearances in one courthouse, and a newer policy of representing nearly all indigent defendants at their first court appearances. Lipetzky has worked for the County's Public Defender's Office since 1990, initially as a deputy public defender, and in her current position as public defender for the County she is a department head in charge of the Public Defender's Office and sets policy for the office. Martin Reply Decl. (dkt. 142-1) Ex. 14 (Lipetzky Dep.) at 329, 7:12–8:16; *id.* at 338, 23:13–15.

In 2010, defendants charged with misdemeanors in the County were arraigned without counsel, and if they desired appointment of counsel, were referred by the court to the Public Defender's Office and required to come back for another court appearance at a later date. *Id.* at 012–13, 22:18–23:12. According to Lipetzky, many defendants waived their right to counsel and proceeded without counsel at the first appearance. *Id.* at 013, 23:3–12. Lipetzky had set a goal in 2010 of providing counsel for all misdemeanor defendants' first court appearances. *Id.* at 012, 22:10–17.

Although Lipetzky provided some testimony regarding the arraignment process for out-of-custody misdemeanor defendants, she testified that she was "not sure [she] ever knew what the

10

misdemeanor process was" for in-custody defendants, and that she could instead "speak to [the process for] felony in-custody clients." Baker Decl. (dkt. 129) Ex. D (Lipetzky Dep.) at 44:5–11. After reading the charges at a felony defendant's first appearance, the court would ask if the defendant could hire an attorney. *Id.* at 44:12–14. If the defendant said "no," the court would refer the case to the Public Defender's Office and set the matter for a subsequent "counsel-and-plea" calendar date, and "sometime between that time and the time of the next court date," the Public Defender's Office would get the referral. *Id.* at 44:15–16. According to Lipetzky's declaration, the referrals were provided "by the following business day" along with "the complaint and discovery if available." Lipetzky Decl. (dkt. 131) ¶ 3. Some courthouses had "counsel-and-plea" calendars twice each week, while others had only one per week. *Id.*; Baker Decl. Ex. D (Lipetzky Dep.) at 45:3–9. Lipetzky did not know how the courts determined which calendar to set a defendant's second appearance for, and was not aware of any cases where a court set the appearance further out than one of the next two "counsel-and-plea" days, or longer than two weeks from the first appearance. Martin Decl. Ex. 1 (Lipetzky Dep.) at 084–86, 109:19–111:20. The Public Defender's Office had no involvement in setting the second appearance date. Lipetzky Decl. ¶ 3. A page of the Public Defender's Office's website listing answers to frequently asked questions included a section briefly describing this process. Martin Decl. Ex. 1 at 037. Lipetzky states in her reply declaration that she is aware of other California counties that did not provide counsel at indigent defendants' first court appearances in 2011. Lipetzky Reply Decl. (dkt. 141-2) ¶ 4.

According to Lipetzky, after receiving a referral, her office conducted an initial investigation into whether the referred person was financially eligible and whether conflicts or excessive caseload precluded the main Public Defender's Office from taking the case, which began usually one or two days after receipt of the referral with "a paralegal visiting the person at the jail to gather information such as financial status, information relevant to a potential bail motion, and basic information about the charged offense." Lipetzky Decl. ¶ 4. The office would "take steps to address" any "immediate needs" disclosed during that initial interview, "such as mental health concerns, injuries that needed to be documented, misidentity, or the need to preserve

11

evidence that could be lost or destroyed." *Id.* The Public Defender's Office would then check for conflicts of interest and determine if it had sufficient staffing to take the case, and would refer clients that it could not take on to the County's Alternate Defender's Office, which would check for its own conflicts. *Id.* ¶ 5. If the Alternate Defender's Office also could not represent the client, it would refer the matter to the conflict panel, which would appoint an attorney from the panel. *Id.*

Lipetzky testified that she did not "challenge" the County's policy of bifurcating arraignments in 2010. Martin Decl. Ex. 1 (Lipetzky Dep.) at 026, 73:10–14. She did not recall whether she "raise[d] the issue with anybody" in 2011. *Id.* at 026, 73:15–22. She testified at her deposition that she did not "take any action prior to [receiving Farrow's government claim in this case] to stop this practice" of bifurcating arraignments, *id.* at 026–27, 73:23–74:10, but states in a reply declaration that during her 2017 deposition, her "memory was hazy on the exact timing of [her] actions in 2012," and that subsequent review of documents refreshed her memory that at the time she received Farrow's claim on June 26, 2012, she had in fact already implemented a pilot project at the Delta courthouse and developed and begun soliciting funding for a program to further expand representation at indigent defendants' first appearances, as discussed below. Lipetzky Reply Decl. ¶ 2 (citing Lipetzky Decl. Ex. G).

In "mid-2012," deputy public defenders began representing out-of-custody misdemeanor defendants at their first appearances through a pilot program at the Delta courthouse, located in Pittsburg, California. Lipetzky Decl. ¶ 11; Martin Decl. Ex. 1 (Lipetzky Dep.) at 018, 34:5–15. At some point—the date is not clear from the record—Lipetzky stated that her office would expand representation at first appearances to other courthouses if staffing levels increased. *Id.* at 028, 32:3–22. Plaintiffs' counsel asked Lipetzky if she agreed that she had a legal mandate to provide such representation, but her answer is not included in the excerpt in the record. *Id.* at 028, 32:23–25.

In a document dated June 7, 2012 discussing funds provided under the Public Safety Realignment Reform Act of 2011, also known as Assembly Bill 109, Lipetzky proposed creation of the Arraignment Court Early Representation ("ACER") program to provide counsel at all in-

custody indigent defendants' first court appearances, a proposal that Lipetzky had developed over the preceding months. Lipetzky Decl. ¶ 12 & Ex. G. Lipetzky states that her decision to develop and implement the ACER program was not related to this or any other litigation. *Id.* ¶ 18. A report dated July 13, 2012 further discussed the proposal. Martin Decl. Ex. 1 at 032. That report stated that indigent defendants did not have a real opportunity to request lower bail or release on their own recognizance until their second, counseled court appearance, and that providing representation at the first appearance would save the county money because fewer defendants would ultimately be held in pretrial custody. Martin Decl. Ex. 1 at 064. Based on statistics from the ACLU, the report stated that roughly eighty-five percent of the County's jail population was made up of defendants awaiting trial, which was higher than both the state and national averages. Martin Decl. Ex. 1 (Lipetzky Dep.) at 054, 62:7–25. A September 2012 report describing the proposal indicated that it would resolve the problem of such defendants having to "wait a period of time—between 7 and 14 days—in custody before their next court date when they will have an attorney to represent them." Martin Decl. Ex. 1 at 034. Lipetzky testified that those times were "not entirely accurate for every case, but yes." Martin Decl. Ex. 1 (Lipetzky Dep.) at 033, 55:10–25. Lipetzky testified that she believed the longest period a defendant spent in custody between the first and second appearances was "about 13 days," but she had not researched the issue. *Id.* at 083, 47:14–20.

Funding was secured for the program, and the Public Defender's Office was able to provide counsel at defendants' first appearances beginning January 9, 2013, except for out-of-custody misdemeanor defendants at the Richmond courthouse.[8] *Id.* at 055, 83:1–6; Lipetzky Decl.

---

[8] As of the date of Lipetzky's deposition in this case, the Richmond courthouse did not permit attorneys from the public defender's office to represent out-of-custody misdemeanor defendants at their first court appearances. Martin Decl. Ex. 1 (Lipetzky Dep.) at 018, 34:17–38:9. In many cases, judges at that courthouse will present unrepresented misdemeanor defendants with three options: (1) the defendant can resolve a case for some negotiated disposition presented by the court at the first appearance; (2) the defendant can hire a private lawyer and return at a later date; or (3) the court can refer the defendant to the public defender's office. *Id.* at 023–25, 39:11–41:9. According to Lipetzky, when attorneys from the public defender's office attempted to inform defendants of their availability represent them before the calendar for first appearances began, the court instructed them not to. *Id.* at 025, 41:10–24. Lipetzky has not taken legal action in response to the Richmond court's policy prohibiting such representation. *Id.* at 021, 37:18–20. That policy is not at issue in this case. Neither Farrow nor Wade appeared in the Richmond courthouse or

13

¶¶ 13–14 & Exs. J–M. The Public Defender's Office has "staffed the initial appearance" or arranged for conflicts panel representation of all defendants at their first appearances at other courthouses, as well as all felony defendants and in-custody misdemeanor defendants in Richmond. Martin Decl. Ex. 1 (Lipetzky Dep.) at 078, 50:1–12; Lipetzky Decl. ¶¶ 15–16. "In the case of an obvious conflict, such as multiple defendants charged with the same offense, the case will be referred to the Alternate Defender's Office and the matter continued a short period of time (not more than two days) for appearance by" an attorney from that office. Lipetzky Decl. ¶ 15. As a result of implementation of the ACER program, some defendants have been released from custody sooner than they would have been under the old system of bifurcated arraignments. Martin Decl. Ex. 1 (Lipetzky Dep.) at 038, 66:1–6. When such defendants receive sentences for time served, or have a case disposed of at the first appearance, the new policy has resulted in some defendants spending less total time in jail. *Id.* at 039, 69:1–8. Lipetzky has not kept accurate statistics of how many defendants are released at the first appearance under the new system, but testified that in aggregate, she believes the ACER program has reduced the number of pretrial custody days for indigent defendants. *Id.* at 045, 97:11–22; *id.* at 078, 50:18–21. She states in her declaration that she "commit[s] to continue the current practice of staffing the arraignment courts with an attorney and a legal assistant" even if the County were to discontinue funding for the ACER program, which she has "no reason to believe" would occur. Lipetzky Decl. ¶ 17.

Lipetzky testified that under the old system, defendants who had been misidentified or were ultimately acquitted sometimes spent longer in jail than they would have under the new system. Martin Decl. Ex. 1 (Lipetzky Dep.) at 041–43, 77:7–15, 81:23–82:12. In Lipetzky's approximately twenty years of experience as a deputy public defender, during the period when courts in the County used the bifurcated arraignment system, some of her clients were released from custody as a result of bail motions at the second court appearance, and she testified that they "presumably" would have been released at the first appearance if they had been provided with representation at that appearance. *Id.* at 027, 74:11–25; *id.* at 040, 75:13–25; *but see* Lipetzky

faced misdemeanor charges, and the Superior Court is not a defendant here.

Reply Decl. ¶ 3 (clarifying that Lipetzky has "no personal knowledge of any instance where a criminal defendant served additional time in pretrial detention as a result of [her] office not staffing the initial appearance"). Lipetzky testified that a defendant who "has to stay in jail longer than necessary . . . risk[s] losing jobs, losing their housing, losing custody of their children, those sorts of things." Martin Decl. Ex. 1 (Lipetzky Dep.) at 039, 69:22–25. In a report promoting the ACER program, Lipetzky wrote that it would reduce recidivism by allowing defendants to maintain employment and community ties that would otherwise be jeopardized during pretrial detention. *Id.* at 061–62, 71:3–72:13.

A January 2016 performance review of the ACER program stated that "roughly between 20% and 40% of all detained defendants" were released at their first appearances, and that "roughly 10% of all cases" received expedited dispositions. Martin Decl. Ex. 1 at 047. Lipetzky testified that she had no reason to doubt those numbers but could not say whether they were true. Martin Decl. Ex. 1 (Lipetzky Dep.) at 046, 98:3–5. A February 2016 report on the program in fiscal year 2014/2015 stated that the program facilitated pretrial release and early case resolution, and cited statistics on the percentage of cases where those goals were achieved. Martin Decl. Ex. 1 at 050. Lipetzky testified that she could not confirm the accuracy of the statistics but she agreed that the program helped achieve those goals. Martin Decl. Ex. 1 (Lipetzky Dep.) at 048–49, 100:7–101:20. One report indicated that ACER had saved the courts and sheriff's department money, but Lipetzky testified that she could not confirm whether that was true. *Id.* at 065, 86:9–25; Martin Decl. Ex. 1 at 066. She testified that ACER has required increased resources from the Public Defender's Office because the old system of regularly scheduled plea-and-counsel calendars was more efficient for the office than appearing at every first appearance, even though it was less efficient for defendants themselves. Martin Decl. Ex. 1 (Lipetzky Dep.) at 078–79, 50:22–51:13.

In a report dated July 1, 2012 assessing the performance of the Public Defender's Office in fiscal year 2011/2012, Lipetzky wrote that the office had a shortage of felony attorneys and was "unable to fulfill its mandate to provide competent representation to all of the clients referred to" it. Martin Reply Decl. Ex. 14 at 322. As a result, the office had "steadily increased" the number

of cases it referred to private attorneys through the conflicts panel, reaching "roughly 75 per month, at significant ongoing cost to the County." *Id.*; *see also* Martin Reply Decl. Ex. 14 (Lipetzky Dep.) at 341–42, 26:14–27:20. Lipetzky testified that in those instances the office could not take on more clients while maintaining constitutional representation for its existing clients. Baker Decl. Ex. D (Lipetzky Dep.) at 27:14–20. From January of 2010 through January 13, 2013, Lipetzky did not receive any complaints from the conflicts panel about the timeliness of referrals to the panel. Lipetzky Decl. ¶ 7.

### 3. Plaintiffs' Experiences With Delayed Appointment of Counsel

#### a. <u>John Farrow</u>

Farrow was arrested on August 30, 2011 on charges including assaulting and threatening his domestic partner. Baker Decl. Ex. A (Farrow Dep.) at 12:18–13:1; Baker Decl. Ex. E. Farrow's first court appearance took place at the Walnut Creek courthouse of the Superior Court for the County of Contra Costa at 1:30 PM on Friday, September 2, 2011 before Judge Nancy Stark. Martin Supp'l Decl. (dkt. 134) Ex. 4 (Superior Court Clerk's Docket and Minutes) at 160. Judge Stark asked Farrow if he could afford counsel, to which he replied "[a]bsolutely not," and if he wanted a lawyer, which he said he did. Baker Decl. Ex. A (Farrow Dep.) at 18:25–19:8. Judge Stark referred the matter to the public defender and to the probation department for a bail study, and continued proceedings to September 15, 2011 at 9:00 AM. Martin Supp'l Decl Ex. 4. The clerk's minute order appears to indicate that bail was set at $106,000 and Farrow was remanded to county jail. *Id.*

Farrow met with Lorrie Silva, an employee of the Public Defender's Office, on September 6, 2011. Baker Decl. Ex. C (Requests for Admissions) ¶ 7. Silva completed an applicant interview and provided notes to the Public Defender's office, including that Farrow had no relevant medical or psychiatric history, that he had been in custody since August 31, and that he would like a copy of the police report. Lipetzky Decl. ¶ 6 & Ex. B. According to Lipetzky, neither the referral packet provided to the Public Defender's Office nor Silva's interview with Farrow disclosed any urgent issues requiring attention before his next appearance date. *Id.* ¶ 6. Lipetzky determined that neither the Public Defender's Office nor the Alternate Defender's Office

could take on Farrow's case due to their existing caseloads, and referred the case to the conflicts panel on September 14. *Id.* ¶ 8. Lipetzky states in her declaration that her "office never received a direct request from Mr. Farrow to represent him in this criminal proceeding and was never appointed by the Court to represent Mr. Farrow in this criminal proceeding." *Id.* Farrow's attorney Christopher Martin, who also represented Wade in his criminal case and represents both Plaintiffs in this action, learned that he would represent Farrow in his criminal case at 1:57 PM on September 14. Baker Decl. Ex. C ¶ 2; Baker Decl. Ex. F (Martin Dep.) at 9:25–10:6; Baker Decl. Ex. G. Martin did not do anything related to the case that day. Baker Decl. Ex. F (Martin Dep.) at 12:4–7; Baker Decl. Ex. H (billing records).

Farrow appeared again on September 15 with Martin representing him, pleaded not guilty to all counts, and appears to have been again remanded to the county jail with bail set at $106,000. Martin Supp'l Decl Ex. 4 at 162. That appearance was the first time Farrow met Martin, and they discussed the case while Farrow was in a holding area near the courtroom, including issues of bail and the fact that Farrow was upset that he had been in custody for weeks without representation. Baker Decl. Ex. A (Farrow Dep.) at 30:8–11; Baker Decl. Ex. F (Martin Dep.) at 13:23–15:14. Martin objected at that hearing to the fact that Farrow had been in custody for thirteen days without a lawyer and asserted that Farrow had been prejudiced by the delay and lack of counsel at his first appearance, but the presiding judge stated on the record that she did not find Farrow's rights had been violated. Baker Decl. Ex. C ¶¶ 16–18; Baker Decl. Ex. I (transcript of state court proceedings). Martin did not formally request a bail reduction. Baker Decl. Ex. C ¶ 20. Martin did not "perform any legal services" on Farrow's behalf until the court appearance on September 15, and did not begin reviewing discovery until September 19. *Id.* ¶¶ 9–10. Martin testified that "the Court doesn't formally appoint in Contra Costa County" and, as is its typical practice, did not discuss appointment of counsel at the hearing, and that he had "accepted appointment through [the public defender's conflict program]" when he spoke to someone from that office. Baker Decl. Ex. F (Martin Dep.) at 14:4–19.

Martin did not request that an investigator seek to locate relevant witnesses until after a preliminary examination on September 27, 2011, and in fact did not communicate with

investigator Kent Ringgenberg until November 7. Baker Decl. Ex. C ¶ 5. He testified at his

deposition that his decision to engage the investigator to locate those witnesses was based on the

complaining witness's testimony at the preliminary hearing. Baker Decl. Ex. F (Martin Dep.) at

19:1–20:11. Ringgenberg attempted to locate the witnesses on approximately November 14, but

was not successful. *Id.* at 26:1–22. Farrow ultimately reached a plea agreement in which he

waived his appellate rights and was sentenced to 270 days in county jail. Baker Decl. Ex. A

(Farrow Dep.) at 40:9–25, 47:1–14; Baker Decl. Ex. L (plea agreement form).

### b. Jerome Wade

Wade was taken into custody on November 8, 2011 and held at juvenile hall. Martin

Reply Decl. Ex. 13 (Wade Dep.) at 309–10, 16:22–17:3. Wade's first court appearance took place

at the Walnut Creek courthouse before Judge Stark on Monday, November 14, 2011. Martin

Supp'l Decl. Ex. 5 (Superior Court Clerk's Docket and Minutes) at 165. Judge Stark asked if

Wade needed and could afford a lawyer, and Wade asked Judge Stark to appoint a lawyer for him.

Martin Reply Decl. Ex. 13 (Wade Dep.) at 311–12, 18:20–19:2. Judge Stark referred the matter to

the public defender and to the probation department for a bail study, and continued proceedings to

November 21, 2011 at 8:30 AM. Martin Supp'l Decl. Ex. 5 at 165. The clerk's minute order

appears to indicate that bail was set at $4,350,000 and Wade was remanded to county jail. *Id.*

The Public Defender's Office determined on November 17, 2011 that it had a conflict of

interest because it was taking on representation of one of Wade's four codefendants, and therefore

referred his case to the Alternate Defender's Office. Lipetzky Decl. ¶ 9 & Ex. D. The Alternate

Defender's Office decided to represent another codefendant and determined on November 18 that

it too had a conflict as to Wade. *Id.* ¶ 9 & Ex. E. As with Farrow, Lipetzky states that Wade

never directly requested that the Public Defender's Office represent him and the court never

appointed the Public Defender's Office to do so. *Id.* ¶ 9.

Martin had a telephone conversation with someone from the conflicts panel regarding

taking on representation of Wade's case at 10:22 AM on November 18, 2011—the same day that

the Alternate Defender's Office determined it could not represent him—and received an email

from the panel at 10:56 AM confirming the referral and attaching the "Crimetime calculation" and

18

the complaint. Baker Decl. Ex. F (Martin Dep.) at 31:23–33:5. Martin began working on the case that day, including conducting legal research, and met with Wade at juvenile hall the following day (Saturday, November 19) to discuss the case, including whether Wade had been instructed as to his rights before he made certain admissions during an interrogation. *Id.* at 37:16–39:4; Baker Decl. Ex. R (billing records).

Wade appeared again on November 21, 2011 with Martin representing him, pleaded not guilty to all counts, and appears to have been again remanded to the county jail with bail set at $4,350,000. Martin Supp'l Decl. Ex. 5 at 167. Martin requested authorization to engage Ringgenberg as an investigator for Wade's case, specifically for the issue of whether Wade had received *Miranda* warnings, on November 29. Baker Decl. Ex. F. (Martin Dep.) at 42:9–14. On November 30, Martin asked Ringgenberg to report back on that issue "much sooner" than the next court appearance on December 12. *Id.* at 44:7–20. At some point, no later than December 29 but possibly before that, Martin learned that at least part of Wade's interrogation had been recorded. *Id.* at 40:15–22, 49:14–51:6. Martin considered pursuing a motion related to the *Miranda* issue but he and Wade decided instead to withdraw the motion as a condition of accepting a time-limited plea deal offered by the prosecutor. *Id.* at 58:1–11. Ringgenberg did not recall at his deposition whether Martin also asked him to investigate what Wade was wearing during the interrogation. Baker Decl. Ex. J (Ringgenberg Dep.) at 22:10–13.

Wade pleaded guilty to three counts against him on December 6, 2012, approximately one year after Martin began negotiating a deal with the prosecutor on his behalf. Baker Decl. Ex. O (Wade Dep.) at 24:21–25:24. Wade testified that he actually committed the crimes to which he pleaded guilty and that he was satisfied with Martin's representation of him. *Id.* at 29:12–23. He received credit towards his sentence for the time he spent in jail before sentencing. *Id.* at 71:24–72:10.

#### 4. Expert Witness Reports and Testimony

##### a. Robert Boruchowitz

Plaintiffs submit an expert witness report from Professor Robert Boruchowitz. *See* Martin Decl. Ex. 2. Boruchowitz is an attorney with "43 years of experience in public defense."

Boruchowitz Report[9] at 17. He served as director of The Defender Association in Seattle for twenty-eight years, supervising as many as ninety attorneys and negotiating "contracts with government funders at the city, county and state level" for which The Defender Association provided service as public defenders. *Id.* at 18 ¶ 3. Boruchowitz also served as a staff attorney for The Defender Association, representing defendants in a variety of criminal proceedings, from juvenile and misdemeanor cases to at least one case involving capital charges. *Id.* at 19 ¶¶ 6–7. Boruchowitz participated in the development of public defender standards and model contracts for the American Bar Association and Washington State Bar Association, among other entities. *Id.* at 19 ¶¶ 8, 11. He has consulted for public defender services and associations, or the courts that oversee those services, in a number of states including Washington, Idaho, Utah, Michigan, Wisconsin, Louisiana, Arizona, and Nevada, and has founded or worked with several organizations dedicated to indigent criminal defense. *See generally id.* at 19–21. He is a "Professor from Practice" and serves as director of the Defender Initiative at the Seattle University School of Law, *id.* at 20–21 ¶¶ 17–18, and has written and spoken extensively, as well as testified as an expert, on matters related to public defense, *id.* at 21–26 ¶¶ 23–27. Boruchowitz relied on his experience in the field, "relevant state and federal law as to what constitutes effective assistance of counsel," and various standards, guidelines, and published ethical opinions in reaching his opinion. *Id.* at 17 ("Law and Experience Relied On"). He also reviewed the transcripts of both Plaintiffs' depositions, although he did not review Martin's or Ringgenberg's depositions, Martin's timesheets, or the file on Wade's criminal case. Martin Opp'n Decl. (dkt. 135-1) Ex. 12 (Boruchowitz Dep.) 10:13–11:9, 16:18–22, 21:25–22:4, 57:5–6.

Boruchowitz describes the scope of his report as follows:

> I was requested to provide an opinion on whether and in what manner having a policy of leaving indigent criminal detainees unrepresented in jail for a period of one to two weeks or more poses a "grave potential for prejudice" based on the totality of the circumstances test, which should include, but not be limited to, prejudice at later "critical stages" of the proceedings. I was also

---

[9] Boruchowitz's report appears in the record as a portion of Exhibit B to Christopher Martin's declaration in support of plaintiffs' motion (Bates numbers 090 through 116), and as Exhibit A to Cameron Baker's declaration (dkt. 127) in support of the County's motion to exclude the report.

requested to provide an opinion on whether the Contra Costa
Defender's policy violated California Government Code section
27706.

*Id.* at 1 ¶ 1. Citing case law, Boruchowitz states his opinion that "it is not reasonable to delay appointing counsel for five to thirteen days or longer after the right counsel attaches as articulated in *Rothgery*," and that "the delay in appointing counsel of five to thirteen days or longer violates California Government Code section 27706." *Id.* at 1–2 ¶¶ 4–7.

According to Boruchowitz, "[n]ational and state standards require that counsel be provided at the earliest possible time after an accused person is arrested, charged, or appears in court, whichever is earliest." *Id.* at 2 ¶ 8. He cites a number of standards and guidelines discussing the importance of timely representation. *Id.* at 2–5 ¶¶ 9–14. Some of those standards call for provision of counsel at specific points in the criminal process—such as the American Bar Association Standards for Providing Defense Services ("Counsel should be provided to the accused as soon as feasible and, in any event, after custody begins, at appearance before a committed magistrate, or when formal charges are filed, whichever occurs earliest."), the Washington State Bar Association Performance Guidelines for Criminal Defense Representation ("If the client is in custody, contact should be within 24 hours of appointment and shall be within no more than 48 hours unless there is an unavoidable extenuating circumstance."), a 1976 report of a commission of the National Legal Aid and Defender Association (calling for representation as soon as "[t]he person is arrested or detained," or when the person reasonably believes criminal process will commence), and the National Advisory Commission on Criminal Justice Standards and Goals ("Public representation should be made available . . . beginning at the time the individual either is arrested or is requested to participate in an investigation that has focused upon him as a likely suspect.")—while others speak more generally about the importance of prompt representation. *See id.*

Boruchowitz lists the following potential consequences of delay in appointing counsel for in-custody defendants: (1) defendants could suffer injury, illness, or death in jail while awaiting a second court appearance; (2) the mental condition of mentally ill defendants could deteriorate, which appointment of counsel can help to mitigate due to not only the potential for obtaining

release, but also the possibility of arranging for treatment in jail; (3) defendants could lose employment, housing, child custody, or medical benefits; (4) a delayed investigation can result in loss of evidence, including witness recollections; (5) defendants might not be able to bring a petition for habeas corpus to challenge unlawful confinement; (6) for defendants who can easily be shown to be innocent, delay in appointing counsel can result in delay making that innocence known and having charges dismissed; (7) juvenile defendants can face "additional challenges" due to vulnerability to peer pressure; (8) delays in obtaining discovery can cause delays in all phases of the prosecution; (9) prosecutors might set limits on plea bargain offers, and delays in appointing counsel can further limit the amount of time counsel has to discuss an offer with the defendant; and (10) failure to have counsel promptly available while a defendant is in custody can lead to mistrust between the attorney and client once an attorney is appointed. *Id.* at 5–8 ¶¶ 15.1–15.12; *see also id.* at 12–15 ¶¶ 37–48 (elaborating on some of those categories of potential consequences). Boruchowitz notes a California Penal Code statute permitting any attorney to visit a prisoner upon the prisoner's request, and asserts that the County's Public Defender's Office should have sent an attorney to visit each defendant after the court referred the defendant to that office. *Id.* at 8 ¶ 15.13.

In a section titled "Three Days in Jail Can Harm a Client," Boruchowitz states that he "agree[s] with an experienced public defender who wrote" that "'three days in jail can be life destroying'" due to potential effects on medication, employment, and child custody or care. *Id.* at 8 ¶ 16. Boruchowitz construes the 1984 letter discussed above as demonstrating obliviousness to client needs and also as evincing an ability to provide counsel in three days, which is less than the delay that either Plaintiff faced in this case. *Id.* at 8 ¶¶ 17–18.

Boruchowitz reviews various statements by Lipetzky and the Public Defender's Office, beginning with her 2010 comments to a county newspaper that she believed providing attorneys at misdemeanor defendants' first court appearances would protect their constitutional rights, and extending through the development and assessment of the ACER program. *Id.* at 9–12 ¶¶ 23–35. He concludes that these statements show that Lipetzky "has known for years that her office should be providing counsel . . . at arraignment," and that the successful implementation of the ACER

program shows that the County could and should have put such a policy in place sooner. *Id.* at 9–12 ¶¶ 22, 27, 33, 36.

With respect to California Government Code section 27706, Boruchowitz discusses the language of the statute and several decisions by California courts, as well as a decision by the highest court of Maryland interpreting what Boruchowitz characterizes as a similar statute. *Id.* at 15–17 ¶¶ 50–55. He concludes that the period between Plaintiffs' first and second court appearances was itself a "stage of the proceedings" within the meaning of section 27706, and that to effectively fulfill the requirements of the statute, a public defender "should begin representation as soon as possible, and not wait for five to thirteen days to meet the client at a second appearance." *Id.* at 16 ¶ 51. Boruchowitz testified that his "process for determining whether or not there was a violation of" section 27706 was "that [he] read the statute, and then [he] read cases discussing the statute." Martin Opp'n Decl. Ex. 12 (Boruchowitz Dep.) at 45:21–25.

Boruchowitz testified at his deposition that a public defender "might get some hints of" the specific needs and risks of a client "in highly publicized cases," but that a defender "need[s] to see the client as soon as possible to assess all those factors effectively." *Id.* at 67:25–68:15. He testified that, in his opinion, it would not have been reasonable for Plaintiffs' counsel (who in addition to representing them here, also was appointed to represent them in their criminal cases) "to delay interviewing those clients for five to thirteen days or longer." *Id.* at 69:16–20. Boruchowitz also testified that he considered the issue of whether the County failed to provide counsel in a reasonable period of time to be "a *Cronic* problem," referring to the Supreme Court's decision in *United States v. Cronic*. *Id.* at 14:21–15:23.

Asked by defense counsel how much time is required to prepare for an arraignment, Boruchowitz testified that if appointed in advance, a lawyer "should spend a good hour meeting with the client before you do anything," and if "appointed right there in the courtroom, you try to take as much time as the judge will give you." *Id.* at 28:7–16. Boruchowitz also acknowledged that there "are still states that do not have representation of counsel at the initial hearing," that he has "observed a number of states that do not provide counsel at the initial appearance," and that there have been "instances where counsel was not appointed for months sometimes after the initial

appearance." *Id.* at 20:19–21:7, 34:2–10. Boruchowitz did not know whether there was a "consistent practice" as to that issue in California. *Id.* at 41:2–20. As a matter of "personal belief," however, Boruchowitz believes "that counsel should be there from the very beginning," "even though we don't have federal case law yet on when the appearance of counsel is required" and "even though the U.S. Supreme Court has not yet held it." *Id.* at 35:8–16.

A U.S. Department of Justice report discussed during Boruchowitz's deposition identifies Arkansas, Delaware, Iowa, Montana, New Hampshire, New Jersey, South Carolina, Virginia as states that in fiscal year 2013 lacked guidelines calling for attorneys to be present at bail hearings and arraignments, although many other states had such guidelines. Baker Reply Decl. (dkt. 141) Ex. B at 25, App'x Tbl. 3. States were also split as to whether they had guidelines calling for appointment of interim counsel within one day, and as to whether they had guidelines for appointment of permanent counsel within three days. *Id.* The table summarizing various states' guidelines does not include all fifty states, and California is among the states omitted.[10] *See id.* Boruchowitz testified that he was not aware of standards specific to California requiring representation at initial appearances, although he believed such representation was required by section 27706 "because it's a stage," and he identified several provisions of California's guidelines for indigent defense that more generally call for prompt and zealous representation. Martin Opp'n Decl. Ex. 12 (Boruchowitz Dep.) at 59:15–61:15.

b. Henry Coker

The County retained Henry Coker as an expert witness. Coker is an attorney who worked for the San Diego County Public Defender's Office from 1989 until his retirement in 2017, including serving as the public defender (i.e., the head of the department) from 2009 through 2017. Martin Decl. Ex. 3 at 122 ¶ 1; *see also id.* at 134–36 (Coker's resume). Like Boruchowitz, he was asked in this case to consider whether the County's former practice of "not providing

---

[10] The report appears to be limited to states that had "state-administered" indigent defense services (as well as the District of Columbia) as opposed to states with services administered at a local level. *See* Baker Reply Decl. Ex. B at 1. The report, prepared by Suzanne M. Strong, Ph.D., of the Bureau of Justice Statistics, is titled "State-Administered Indigent Defense Systems, 2013." It was published in November of 2016 and revised May 3, 2017. *See id.*

public defender attorney staffing at the initial appearance of an in-custody criminal defendant in state court, which might have resulted in a delay in the provision of appointed counsel to the defendant detainees for a period between two days to thirteen days complied with the 'reasonable time' requirements for the provision of counsel articulated in *Rothgery*," as well as whether Lipetzky violated section 27706. *Id.* at 122–23 ¶ 2. He concluded based on his experience and review of documents and applicable law that "the timing of the actual provision of appointed counsel in Contra Costa County complied with" both *Rothgery* and section 27706. *Id.* at 123 ¶¶ 3–4.

According to Coker, although "[l]ocal jurisdictions may choose to provide stronger protections, and organizations such as the American Bar Association and the National Legal Aid and Defender Association may recommend even higher standards . . . those higher standards are not relevant to" determining what the Sixth Amendment requires. *Id.* at 123 ¶ 6.

Coker states that "the evidence indicates" that under the old policy of bifurcated arraignments, "counsel was typically 'provided' or 'assigned' to the case before the actual date of the 'counsel-and-plea' hearing," and the date on which counsel was actually assigned to the case is more relevant than the date of that second court appearance. *Id.* at 124 ¶ 9.

He describes the timeline of Wade's case as follows: Wade's first appearance was on Monday, November 14, 2011, the judge set the second appearance for Monday, November 21 (one week after the first appearance), the conflicts panel called Plaintiffs' counsel Christopher Martin the morning of Friday, November 18 (four days after the first appearance), and Martin started work on the case that day and interviewed Wade the following day, Saturday, November 19. *Id.* at 124 ¶ 10; *see also id.* at 131 (summarizing the timeline in a table). According to Coker, that timeline was reasonable, and allowed Martin sufficient time to prepare for the November 21 arraignment hearing as well as subsequent stages of the case. *Id.* Coker states that the seriousness of the charges, as evidenced by judge setting bail at several million dollars,[11] rendered "the bail

---

[11] Coker's report transposes the digits of Wade's bail, stating that it was set at $3,450,000, as opposed to the figure of $4,350,000 that appears in court documents in the record. *Compare* Martin Decl. Ex. 3 at 124 ¶ 10 *with* Martin Supp'l Decl. Ex. 5.

issue . . . moot," as would have been apparent to the judge and to any competent defense counsel. *Id.* Coker notes that Wade was one of four defendants in a "complex" serial robbery case, and that determining how to assign counsel to avoid conflicts of interest in such cases "can, in some cases, take several days in light of the need for thorough conflicts checks and informed decisions about which defendants should be represented by internal staff." *Id.* at 125 ¶ 14. He states that the "conflict of interest process took place" on November 17, 2011, one day before Martin was assigned to the case, and concludes that "the fact that attorney Martin's assignment to represent Wade in this complex and serious five-defendant case occurred only four days after Wade's initial court appearance seems quite reasonable under all these circumstances and entirely consistent with diligent efforts to arrange for counsel." *Id.* at 126 ¶ 16.

As for Farrow's case, Coker summarizes the timeline as follows: Farrow first appeared on Friday, September 2, 2011, the judge set his second appearance for Thursday, September 15 (thirteen days later), a staff member from the Public Defender's Office interviewed Farrow on Tuesday, September 6 (four calendar days after the first appearance, and the next business day due to the Labor Day holiday weekend), the conflicts panel called Martin to assign him to the case at 1:57 PM on Wednesday, September 14 (twelve days after the first appearance), and Martin first met with Farrow on Thursday, September 15 (the day of the second appearance, thirteen days after the first appearance). *Id.* at 124 ¶ 11, 127 ¶ 20, 132 (summarizing the timeline in a table). Like in Wade's case, Coker states that the court and competent defense counsel would have known that "the bail review issue was moot," in this case because "Farrow was a twice-convicted felon with a 'no-bail' parole hold." *Id.* at 124 ¶ 11. According to Coker, the staff interview on September 6 "included questions about potential bail issues and the status of [Farrow's] case," and "would have identified, but did not, any matter in Farrow's criminal case requiring immediate attention." *Id.* at 127 ¶ 20. Coker states that although Martin did not meet with Farrow until the date of his second appearance on September 15, he could have interviewed him the afternoon or evening of September 14, the day he was assigned the case. *Id.* at 124 ¶ 11.

Coker also states that because the Public Defender's Office did not have sufficient resources to handle all of the cases referred to it at that particular time, "there needed to be a

26

determination regarding the volume of new cases coming into the Public Defender's Office and the Alternate Defenders Office at that time before a decision could be made to route [Farrow's] case to the Conflicts Panel Office for assignment to outside counsel." *Id.* at 126–27 ¶ 17. Farrow's case was an appropriate candidate for reassignment to the conflicts panel if the Public Defender's Office did not have sufficient resources available because it was "the type of lower level felony case that was very likely to settle without trial." *Id.* at 126–27 ¶ 17. Coker speculates that the Labor Day weekend, and perhaps a large volume of cases associated with "the end of summer vacation[,] . . . parties, and the excessive consumption of alcohol" related to the holiday, could have contributed to the Public Defender's Office's need to refer some cases to outside counsel and to the timeline of Farrow's case, but he states that he "cannot state for certain" the reason for the volume of cases. *Id.* at 127 ¶ 18.

Coker also looks to what happened after each Plaintiff received counsel and appeared in court a second time, and states that those fact patterns support the conclusion that Plaintiffs were not prejudiced by the delay in appointing counsel and that receiving counsel earlier would not have affected their cases. *Id.* at 127–28 ¶¶ 20–21. With respect to section 27706, Coker states that the statute does not address how much time may elapse between a request of counsel and provision of counsel, and that Lipetzky carried out her obligations to both Plaintiffs by assigning them conflict counsel. *Id.* at 128–29 ¶¶ 22–23. He also asserts that the issue is moot in light of the County's commitment to provide counsel at all indigent felony defendants' first appearances under the ACER program that was implemented in the years since Plaintiffs' arraignments. *Id.* at 129 ¶ 23. Finally, Coker responds to some of the points made in Boruchowitz's report, primarily by asserting that the standards and best practices that Boruchowitz invokes go beyond what is required under the Sixth Amendment. *Id* at 129–30.

At his deposition, Coker testified that he "was not asked to look at the whole system," but instead "to take a microscopic look at two cases and render [his] opinion on that." Martin Decl. Ex. 3 (Coker Dep.) at 140, 56:5–7. He declined to offer an opinion on whether it is "reasonable to delay representation for a period of five to 13 days or sometimes longer" in other cases, stating that it would not be an informed opinion. *Id.* at 140–41, 56:19–57:3. He conceded that "as a

matter of good practice [he] would hope that it wouldn't take you two weeks to see the client, even if you have that much time to appear in court," but testified that the reasonableness of the delay would depend on actual and potential harm caused by the delay. *Id.* at 142, 44:3–12. "[A]fter looking at the facts of the two cases and looking at [Martin's] appointment and what [he] did and when [he] did it, [Coker] determined that it was reasonable." *Id.* at 143, 45:6–8. Coker also conceded that a two-week delay in meeting with counsel could cause prejudice or be unreasonable in some cases, such as the facts of the *Rothgery* case where the plaintiff had been held unnecessarily, or where a defendant relied on videotape evidence that was overwritten in the intervening period. *Id.* at 143, 45:9–44; *id.* at 144, 60:11–15. Coker testified generally to the importance of conducting a prompt investigation and that "[i]t is a good practice to interview any client that you're going to represent at the first opportunity you have." *Id.* at 149–53, 27:19–31:10.

Coker testified that "conflicts checks are rather tedious things to do," and that he had experienced cases as a chief deputy public defender "where it took us a week to get it all figured out," although he did not recall a case where a conflicts check took two weeks, and even in those cases his office either appeared for or arranged for private attorneys to appear for each defendant at the first court appearance. *Id.* at 147–48, 71:10–72:2.

Coker was not aware "off the top of [his] head" of any other county in California that used the bifurcated arraignment procedure previously employed by Contra Costa County. *Id.* at 155, 43:5–8.

## C.   The Parties' Present Arguments

The parties' arguments in their briefs on the motions for summary judgment are summarized below. Arguments regarding the County's motion to exclude Boruchowitz's testimony (dkt. 126) are addressed in context in the Court's analysis of that issue.

### 1.   Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment granting equitable relief and nominal damages on their individual claims, or alternatively, summary adjudication of issues including whether they were deprived of their Sixth Amendment right to counsel and whether the County had a policy of

28

deliberate indifference to Plaintiffs' rights.  Pls.' Mot. for Summ. J. ("Pls.' MSJ," dkt. 125) at 1–2.

Plaintiffs contend that to prevail on a Sixth Amendment claim based on the County's policy of inaction, they must show: (1) that they were deprived of a constitutional right; (2) that the County had a policy; (3) that the policy "amounts to deliberate indifference to" the right; (4) that the policy was the "moving force behind" the violation of that right.  *Id.* at 3 (quoting *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).  They argue that *Strickland*'s "individualized analysis requirement" is not the appropriate framework through which to view a case "seeking prospective, systemic reform."  *Id.* at 18 (citing *Church v. Missouri*, 268 F. Supp. 3d 992, 2017 WL 3383301 (W.D. Mo. July 24, 2017)).  Plaintiffs cite decisions from various state courts eschewing individualized analysis in cases based on systemic failure to provide appointed counsel, as well as the Supreme Court's decision in *United States v. Wade*, 388 U.S. 218 (1967), which considered the general risks to a defendant facing a post-indictment lineup without counsel, rather than the particular circumstances of the defendant in that case.  Pls' MSJ at 18–19.  They argue that the Court should look to "the grave potential for prejudice inherent in the written Policy of agreeing to withhold representation till any date the court chooses so long as the date is at least three court days out," and that the circumstances here amount to a systemic violation of indigent criminal defendants' right to appointed counsel because the County's public defender "set no outside limit on the length of the delay, did not pay any attention to the length of the delay, delegated responsibility for the length of the delay in representation to the court, and kept no records from which the outside [i.e., maximum] length of the delay could be determined."  *Id.* at 19.

Plaintiffs argue that the County cannot rely on lack of funding as a basis for delay, *id.* at 20 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)), but that even if the Court were to consider funding as a factor in assessing reasonableness, the evidence shows that providing counsel at indigent defendants' first court appearance actually saved the County money after it changed its policy to do so in most cases.  *Id.* at 21.  They also contend that the County cannot escape responsibility by arguing that the state courts prevented it from providing counsel at defendants' first appearance because the evidence shows that only one courthouse actually prohibits that

practice in some circumstances (the Richmond courthouse, in misdemeanor cases), and because the 1984 letter indicates that the public defender was, at least at that time, prepared to represent defendants three days after their first appearances, as opposed to the longer delays that defendants (including Plaintiffs here) experienced in more recent years. *Id.* Perhaps to some extent contradicting their contention that the courts were not responsible for the delays, Plaintiffs also argue that "eligibility and conflicts checks were never a factor in determining the delay in providing counsel" because the Public Defender's Office "had nothing to do with setting the duration of time between the first and second arraignment proceedings." *Id.* at 22.

Plaintiffs invoke Boruchowitz's report as "document[ing] 55 reasons why [the County's] Policy was unreasonable under the totality of the circumstances," although they do not identify or discuss any of those reasons in their motion. *Id.* They argue that the County "has not contradicted a single study or standard referenced by Professor Boruchowitz, or refuted a single factor that he considered." *Id.* Plaintiffs also rely on a 2012 report by Lipetzky stating that the County had the highest rate of pretrial detainees (as a percentage of the total jail population) in the state, and on the fact that County's expert witness was not aware of other California counties that similarly failed to provide counsel at a defendant's first court appearance. *Id.* at 22–23. According to Plaintiffs, the lack of justification for the earlier "Policy" of failing to provide counsel at first appearances, combined with the potential for prejudice that Boruchowitz identified, establishes that the failure to provide counsel was unreasonable. *Id.* at 23.

Plaintiffs also argue that for purposes of section 27706, the burden is on the County to provide justification for a delay in providing counsel. *Id.* They contend that the County has failed to provide any justification, and that the rationale of the decision of the Maryland Court of Appeals (that state's highest court) applying Maryland's then-existing public defender law in *DeWolfe v. Richmond*, 434 Md. 403 (2012),[12] applies equally to section 27706 in California. Pls'

---

[12] On reconsideration, the Maryland court reached the same conclusion that counsel was required at a defendant's first appearance, but based that conclusion on the Maryland Declaration of Rights (a component of the state's constitution) rather than on the public defender statute, which the state legislature had amended in the intervening period to specifically exclude any requirement for representation at the type of hearing at issue in the case. *DeWolfe v. Richmond*, 434 Md. 444, 454–55, 464 (2013).

MSJ at 23–25.

In support of their request for an injunction, Plaintiffs argue that a constitutional violation with potential to recur satisfies the "irreparable injury" and "inadequacy of legal remedies" requirements, and that although Plaintiffs were ultimately provided with counsel and their criminal prosecutions have since ended, they have standing to seek prospective relief under the "relation back" doctrine discussed by the Supreme Court in *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991), and under the Ninth Circuit's framework for class actions challenging policies or officially sanctioned patterns of unlawful behavior as discussed in *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *abrogated on other grounds as stated in Davidson v. Kimberly Clark Corp.*, 873 F.3d 1103, 1113 (9th Cir. 2017). Pls' MSJ at 26–27. Plaintiffs contend that the subsequent implementation of the ACER program does not moot their claims because "it is reasonable to expect that the practice of denying representation to indigent criminal defendants will recur without the injunction sought," and because the County has not taken action to remedy the Richmond courthouse's practice of prohibiting public defender representation at first appearances of out-of-custody misdemeanor defendants. *Id.* at 28–29. Plaintiffs also argue that they are entitled to nominal damages and declaratory judgment. *Id* at 29–34.

### 2. The County's Opposition to Plaintiffs' Motion for Summary Judgment

The County argues that Plaintiffs' motion should be denied because it fails to address the circumstances of Plaintiffs' individual experiences during their criminal prosecutions. Def.'s Opp'n (dkt. 137) at 1, 12–13. It contends that it "did not have a policy of 'withholding representation' for a period of days," but rather did not provide counsel at first appearances because the Public Defender's Office did not have a sufficient number of attorneys to staff those appearances. *Id.* at 13. Although the County does not dispute that "attachment occurred at the initial appearance," it argues that it is "undisputed that [Plaintiffs] had counsel present at every critical stage," and that the delay in providing counsel was reasonable because Plaintiffs have not presented evidence that it "caused either of them any actual prejudice or posed any grave potential for prejudice." *Id.* at 14.

Despite this Court's previous determination that delayed appointment of counsel under

31

*Rothgery* is its own Sixth Amendment violation distinct from the *Strickland* or *Cronic* tests for ineffective assistance of counsel, *see* Apr. 2017 Order at 25, the County continues to argue that *Rothgery* "should be read in conjunction with" those cases. Def.'s Opp'n at 15. Even if the Court disagrees with that approach, however, the County contends that "a critical or necessary factor in establishing any violation of the right to counsel is the impact, or potential impact, on Plaintiffs' criminal proceedings." *Id.* at 15–16. The County notes that the *Rothgery* decision discussed appointment of counsel within a reasonable time to allow for representation at "critical stages" before trial, and that Justice Alito's concurrence in that case construed the Sixth Amendment right to counsel as protecting only the effectiveness of assistance at trial, not "'other objectives that may be important to the accused.'" *Id.* at 15, 18 (citing *Rothgery*, 554 U.S. at 212, and quoting *id.* at 216 (Alito, J., concurring)).

Turning to the facts of this case, the County argues that Plaintiffs have not presented evidence to support the forms of actual prejudice alleged in their complaint, specifically that the delay in appointing counsel affected Farrow's ability to locate witnesses relevant to his case and Wade's ability to gather statements from a witness while her memory of his interrogation was fresh regarding *Miranda* warnings and whether he was wearing a sweatshirt that tied him to the crimes. *Id.* at 19–21. It contends that the possible forms of prejudice identified by Boruchowitz "do not apply to Plaintiffs themselves," with the exception of Boruchowitz's opinion that Wade faced potential prejudice in obtaining witness statements while the witness's testimony was fresh, which the County argues was not based on review of the actual facts of Wade's case. *Id.* at 22–23. The County contends that Boruchowitz's reliance on professional standards and guidelines is unavailing because he conceded that there is not a national consensus on this issue and that some states do not provide counsel at initial appearances. *Id.* at 23–24.

The County also argues that any statements from Lipetzky suggesting that the previous practice of withholding counsel at first appearances was harmful or unreasonable do not bind the County because a public defender's interests are often adverse to a county's interests in cases like this one, and that the 1984 letter discussing the Public Defender's Office ability at that time to provide counsel for Richmond cases within three days of the first appearance does not establish

32

that longer delays are unreasonable under *Rothgery* because it does not take into account the effect of such a delay on the proceedings. *Id.* at 22–23. The County points to the "undisputed facts" that the state court (not the public defender) set the length of time between appearances, that the Public Defender's Office "took steps to ascertain whether there were any urgent issues needing to be addressed," and that deputy public defenders or appointed conflicts counsel could and sometimes did begin working on a case before the second court appearance. *Id.* at 23; *see also id.* at 26 (arguing that the court's role in setting the second appearance negates any causal link between the County and the alleged violations). The County also argues that, contrary to suggestions made in Plaintiffs' arguments and their counsel's questions during depositions, Plaintiffs cannot analogize a delay in providing counsel to a decision by an attorney already assigned to a case to delay the initial interview of a client, because the latter circumstances are evaluated under the *Strickland* standard and Plaintiffs have not satisfied *Strickland* by showing prejudice here. *Id.* at 24 (citing *Dick v. Scroggy*, 882 F.2d 192 (6th Cir. 1989)). The County contends that Plaintiffs cannot show deliberate indifference to their rights because no decisions now or at the time of the violation clearly demonstrated that the delays at issue were unconstitutional and because Lipetzky never received complaints about delays in referrals to the conflicts panel, among other reasons. *Id.* at 24–26.

The County argues that Farrow is estopped from bringing a claim here because his lawyer objected to the delay in appointing counsel at arraignment, the state court judge did not find Farrow's rights to be violated and overruled the objection, and Farrow waived his appellate rights as part of his plea agreement. *Id.* at 26–28.

As for section 27706, the County argues that Plaintiffs cannot support a claim because they did not make a "direct request for representation" to the Public Defender's Office and the state court did not formally appoint the office to represent them. *Id.* at 28. The County contends that the Maryland case on which Plaintiffs rely is distinguishable because the Maryland statute did not condition the public defender's obligations on a request for or appointment of counsel. *Id.* at 29. The County also argues that the Public Defender's Office acted responsibly in light of the ethical conflicts preventing it from directly representing either Farrow (due to staffing constraints) or

33

Wade (due to a conflict of interest). *Id.* at 29. The County also argues that Plaintiffs' claims for declaratory and injunctive relief are moot, and that no exception to the normal doctrines of mootness and standing applies here. *Id.* at 30–33. Finally, the County contends that certain evidence on which Plaintiffs rely is inadmissible, including Boruchowitz's opinions for the reasons stated in the County's separate motion to exclude, certain parts of Coker's testimony that the County contends were outside the scope of his expert witness designation, statements by Lipetzky that the County argues are hearsay and improper opinion testimony by a fact witness, and the 1984 letter regarding representation at the Richmond courthouse, which the County argues is irrelevant or unduly prejudicial under Rule 403 of the Federal Rules of Evidence. *Id.* at 33–35.

### 3. Plaintiffs' Reply in Support of Summary Judgment

Plaintiffs again argue in their reply that their claims in this "case seeking systemic reform" should "be evaluated in terms of how the Policy [of not providing representation at first appearances] poses a grave potential for prejudice to all detainees," not based on the facts of Plaintiffs' own cases with the benefit of hindsight. Pls.' Reply (dkt. 142) at 7–9. They argue that the evidence shows that the County had a policy of withholding representation for "a period that was typically between 5 and 13 days, but was sometimes longer," and that Farrow and Wade "suffered a constitutional tort" as a result of being subjected to the policy if the policy was unconstitutional. *Id.* at 9–10. Plaintiffs therefore argue that Boruchowitz's conclusions regarding the policy as a whole are sufficient for success on their Sixth Amendment claim. *Id.* at 10. Plaintiffs argue that the County was on notice of the violation based on a criminal case where the issue was raised in 2011 and Lipetzky's own statements. *Id.* at 10–11. Plaintiffs contend that the County, not the state court, was responsible for the delay in appointing counsel because "the Public Defender authored the Policy in 1984" and has ratified that policy through words and conduct in the years since then. *Id.* at 11. Plaintiffs also dispute the County's arguments that the requests for declaratory and injunctive relief are moot. *Id.* at 11–14.

As for the County's evidentiary objections, Plaintiffs argue that Coker's testimony regarding examples of prejudicial conduct falls within the scope of appropriate cross examination and that his lack of awareness of other counties with bifurcated arraignments is an issue of fact,

34

not expert opinion. *Id.* at 14–15. They contend that Lipetzky's statements in various reports and publications are not hearsay, or meet the tests for hearsay exceptions, because they are admissions of a party's agent, fall within the public records exception, or are relevant to show her state of mind, and also that they do not constitute improper expert opinion. *Id.* at 15–18. Plaintiffs argue that the 1984 letter is relevant to the origin and nature of the County's policy regarding indigent representation. *Id.* at 18–19. Plaintiffs address Boruchowitz's testimony separately in their opposition to the motion to exclude. *See id.* at 14.

Plaintiffs conclude by arguing that this Court should adopt a standard that, except in emergency circumstances, counsel should be appointed within forty-eight hours of arrest and provided at the first court appearance, mirroring the requirement for determinations of probable cause established by the Supreme Court's decision in *McLaughlin*, 500 U.S. 44. Reply at 19–20.

### 4. The County's Motion for Summary Judgment

The County argues in its motion for summary judgment that the "'reasonableness' determination focuses on the consequences, if any, of the delay on the criminal defendant's ability to defend the charges against her/him." Def.'s Mot. for Summ. J. ("Def.'s MSJ," dkt. 128) at 18. It contends that the Sixth Amendment only protects the right to a fair trial, and that the Court should reconsider its previous order holding that an unreasonable delay in providing counsel is distinct from the *Strickland* and *Cronic* framework for evaluating ineffective assistance of counsel. *Id.* at 18–20. According to the County, *Cronic*'s presumption of prejudice standard is consistent with the Ninth Circuit's instruction to this Court to consider risk of prejudice, as opposed to only actual prejudice, on remand. *Id.* at 18–19. The County argues that since, in its view, grave potential for prejudice falls within the *Cronic* framework, such a claim would be barred by *Heck*, and "Plaintiffs are limited to [showing] an actual prejudice to their individual cases, which they cannot establish." *Id.* at 21.[13] But even if the Court considers potential for prejudice, the County

---

[13] The County does not address the fact that actual prejudice would presumably satisfy *Strickland*'s test for reversal of Plaintiffs' convictions, and thus would also presumably be barred by *Heck*. Because the Court declines to reconsider its previous determination that unreasonable delay in appointing counsel need not be considered in the framework of *Strickland* and *Cronic*, however, there is no reason to wade back into the *Heck* analysis of the previous order.

35

contends that there is no evidence on which to find such potential. *Id.*

As discussed above in summarizing the County's opposition brief, the County argues that the facts here do not show actual prejudice to either Farrow or Wade as a result of delay in providing counsel. *Id.* at 22–25. The County primarily analyzes Plaintiffs' cases with the benefit of hindsight, arguing that Martin's lack of urgency in engaging an investigator to pursue potentially relevant testimony demonstrates that appointing counsel sooner would not have changed the outcome, and that at least in Wade's case the testimony did not turn out to be material because there was an audio recording of Wade's interrogation. *Id.* The County also argues that Plaintiffs cannot show deliberate indifference by the County, that the delay in appointing counsel was caused by the state court, and that Farrow is collaterally estopped from asserting a Sixth Amendment violation. *Id.* at 25–28. The County contends that the Public Defender's Office's policy of interviewing defendants promptly after referral to identify urgent issues shows that prejudice was not foreseeable from the delay in appointing counsel, and asserts without citation to evidence that "generally speaking, a week or even two weeks is not likely to result in destruction of critical evidence." *Id.* at 27.

The County asks the Court to dismiss the section 27706 claim for lack of subject matter jurisdiction if summary judgment is granted for the County on the Sixth Amendment claim, and argues that even if the Court retains jurisdiction over the state law claim, the County is entitled to summary judgment because the Public Defender's Office did not receive a direct request for representation from Plaintiffs and was not appointed to represent them by the state court, and because the Public Defender's Office could not represent them due to ethical conflicts and properly referred their cases to the conflicts panel. *Id.* at 28–31. The County contends that Plaintiffs' claims for declaratory and injunctive relief are moot. *Id.* at 31–35.

### 5. Plaintiffs' Opposition to the County's Motion for Summary Judgment

Plaintiffs argue that the County's "argument that actual prejudice is required is a nonstarter, as the County bizarrely insists upon a legal standard that both this Court and the Ninth Circuit Court of Appeals have explicitly rejected." Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n to MSJ," dkt. 135) at 6. Plaintiffs also argue that it is not appropriate to focus on the facts

United States District Court
Northern District of California

of their case for assessing potential prejudice, and instead contend that the Court should look "whether a Policy of arbitrarily delaying representation to all indigent jailed criminal defendants for 5 to 13 days, and sometimes longer – *without any reference to the facts of their underlying criminal cases* – poses a grave potential for prejudice." *Id.* Plaintiffs argue that the facts of their cases do, however, support a conclusion that delay caused potential for prejudice—in Wade's case, because the prosecution was able to add charges without having to seek leave of the court, and in Farrow's case, because the need for conflicts counsel was caused by the County's failure to provide sufficient funding to the Public Defender's Office and "myriad potentials for prejudice" could arise from a nearly two week delay that "cannot properly be evaluated in hindsight." *Id.* at 7–8.

Plaintiffs argue that the evidence supports a finding of deliberate indifference, and that the County had a written policy of delaying representation, as memorialized in the 1984 letter, a 2010 statement by Lipetzky to a local newspaper describing the Public Defender's Office's practices, memoranda from 2012 describing the then-current state of affairs in the context of proposals to establish the ACER program, and statements on the Public Defender's Office website. *Id.* at 9–10. Plaintiffs also argue that a lack of sufficient resources to provide counsel at defendants' first appearances is not a valid reason for delay, but instead is itself a failure to meet the County's obligations under *Gideon*. *Id.* at 10. Plaintiffs argue that "California criminal procedure is exacting" and assert, without citation to evidence so stating, that Contra Costa was the only county in California that systematically denied representation to in-custody defendants at their first court appearances. *Id.* at 12.[14] Plaintiffs also argue that the County was on notice of "the problem" as a result of arguments raised "in a motion and petition for writ of mandamus in a case to which it was a party," although Plaintiffs do not contend that the court in that case determined that the County's practices were improper. *Id.* at 13. Plaintiffs contend that Lipetzky's testimony that some defendants remained in jail longer because they did not receive representation and that some

---

[14] Plaintiffs cite Coker's testimony that he did not, "off the top of [his] head," know of other jurisdictions in California that had such a policy. *See* Pls.' Opp'n to MSJ at 12; Martin Decl. Ex. 3 (Coker Dep.) at 155, 43:5–7. That testimony does not show that no other jurisdiction had such a policy.

defendants are now being released earlier under the ACER program demonstrates that defendants who did not receive earlier representation suffered prejudice within the meaning of *Strickland*. *Id.* at 14.

With respect to Lipetzky's testimony that paralegals interviewed defendants after their first court appearances to address "immediate concerns," Plaintiffs argue that "there is absolute no proof of a single case where the Public Defender did anything other than eligibility conflicts checks during the . . . period between appearances," and assert without citation to authority that "the failure to provide proof where a party would logically provide it creates the inference that such proof does not exist." *Id.* at 13.

Plaintiffs contend that Farrow is not estopped from bringing a Sixth Amendment claim because the Sixth Amendment claim was not actually litigated or necessary to the judgment in his criminal case, and the issues are not the same. *Id.* at 14–17. Plaintiffs argue that the *Strickland* and *Cronic* paradigms applicable in criminal cases, including Farrow's case where Martin raised the issue of delayed appointment, do not apply to this civil case. *Id.* at 17.

Plaintiffs concede that section 27706 does not require a public defender to represent a defendant until that defendant requests that the public defender do so or at court appoints the public defender to do so, but argue that where a defendant has told a judge that the defendant would like appointed counsel and the judge referred that request to the public defender, the defendant has effectively requested representation from the public defender within the meaning of the statute. *Id.* at 18–19. Plaintiffs also argue that the County has not offered a sufficient reason why the Public Defender's Office did not have attorneys available to represent defendants at their first appearances. *Id.* at 19.

Plaintiffs contend that their claims for prospective relief are not moot, in part because the County still delays representation by bifurcating arraignment proceedings for defendants where the Public Defender's Office has clear conflicts of interest, in which cases arraignments are continued by up to two days to resolve the conflict. *Id.* at 19–21. Plaintiffs also argue that the new policy shows that delays of more than two days to resolve conflicts issues in their own cases were unreasonable. *Id.* at 21.

Plaintiffs conclude their opposition brief, as in their reply in support of their own motion, with an analogy to the *McLaughlin* case and an argument that the same presumptive deadline of forty-eight hours after a warrantless arrest to conduct a probable cause determination should apply to appointment of counsel. *Id.* at 23–24.

### 6. The County's Reply in Support of Summary Judgment

The County argues in its reply that the steps taken and facts discovered in Plaintiffs' criminal cases after counsel was appointed demonstrate that the delay in providing counsel after their first court appearances did not actually cause prejudice or a grave potential for prejudice. Def.'s Reply in Support of Mot. for Summ. J. ("Def.'s Reply re MSJ," dkt. 141) at 8–10. The County contends that the Court should not consider "hypothetical injuries not present in [Plaintiffs'] own cases," and that regardless, adverse effects to a defendant's pretrial liberty interest are not cognizable as prejudice in a Sixth Amendment claim. *Id.* at 10–11. The County argues that Plaintiffs also have not established that the potential injuries that they cite "are so inherent and frequent in cases where there is no counsel at the initial hearing as to warrant the presumption of prejudice," in contrast to the dangers that the Supreme Court considered when it recognized a right to counsel at post-indictment lineups in *United States v. Wade*, 388 U.S. 218 (1967). Def.'s Reply re MSJ at 11–12. The County further argues that counsel cannot be required under the Sixth Amendment at a defendant's first appearance because *Rothgery* explicitly permits a reasonable period of time to appoint counsel after attachment of the right, and that there is no national consensus on whether counsel must be provided at defendants' first appearances, citing the Department of Justice report surveying state standards. *Id.* at 12–13.

The County briefly contends that Plaintiffs have not shown a policy of deliberate indifference, *id.* at 13–14, that the state court rather than the County was responsible for the length of delay, *id.* at 14, and that Farrow is collaterally estopped from bringing a Sixth Amendment claim, *id.* at 14–15. If the Court does not dismiss the section 27706 claim for lack of jurisdiction, the County argues that it is entitled to summary judgment because a referral from the state court to the Public Defender's Office is not equivalent to a direct request from a defendant or appointment by the court, and because the Public Defender's Office acted reasonably in light of its ethical

39

conflicts after the referrals. *Id.* at 15–16. The County also continues to argue that Plaintiffs'

claims for declaratory and injunctive relief are moot, and that no exception applies. *Id.* at 16–19.

## III.    ANALYSIS

### A.    Motion to Exclude Expert Testimony and Other Evidentiary Objections

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness

who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R.

Evid. 702. This Rule embodies a "relaxation of the usual requirement of firsthand knowledge,"

*Daubert v. Merrel Dow Pharm.*, 509 U.S. 579, 592 (1993), and requires that certain criteria be met

before expert testimony is admissible. The Rule sets forth four elements, allowing such testimony

only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability

and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry

does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science,"

and grants the court "broad latitude not only in determining whether an expert's testimony is

reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as

unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691,

696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided:

"scientific validity for one purpose is not necessarily scientific validity for other, unrelated

purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant."

*Daubert*, 509 U.S. at 591. "Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ." *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted; first ellipsis in original). Moreover, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law[; . . .] instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations and internal quotation marks omitted). An expert nevertheless may, in appropriate circumstances, rely on his understanding of the law and refer to the law in expressing an opinion regarding professional norms. *Id.* at 1016–17.

The County moves to exclude the opinions of Plaintiffs' expert Robert Boruchowitz, arguing that his testimony only "fits" the case if it corresponds to harms that actually befell Farrow and Wade, and faulting Boruchowitz for failing to review evidence regarding the particular prosecutions at issue in this case. Because hindsight is generally inappropriate in assessing *potential* for prejudice, the Court agrees with Plaintiffs that Boruchowitz had no need to review evidence pertaining to proceedings after Plaintiffs' second court appearances, such as the timing of work by investigator Ringgenberg and evidence later available or unavailable. On the other hand, to the extent that the Court's analysis focuses on the particular circumstances of Wade and Farrow's prosecutions, Boruchowitz's failure to discuss those circumstances in any detail renders his opinions unsuited for that analysis.

To the extent that the Court looks more generally to whether the County's former policy violated the Sixth Amendment rights of criminal defendants as a class, Boruchowitz's expertise and experience qualifies him to identify risks associated with delayed appointment of counsel, and his statements identifying such risks are admissible expert opinion. The County's motion is DENIED as to those portions of Boruchowitz's report. But while those ill effects support a conclusion that delay is bad, it is less clear whether they can support a conclusion that a particular period of delay is or is not reasonable. Boruchowitz's ultimate conclusion—that "it is not reasonable to wait to appoint counsel for five to thirteen days after the first court appearance"—is

not based on any discernable framework for determining reasonableness. *See* Boruchowitz Report ¶ 49. Along the same lines, Boruchowitz's "opinion that it is critical to have counsel begin work on the case of an accused person as soon as possible," *id.*, only raises the question of when appointment is "possible." Taken literally, and devoting unlimited resources, it would likely be *possible* to appoint counsel for every defendant the moment that the right to counsel attached, but as discussed below, a rule requiring appointment at that time would be inconsistent with the "reasonable time after attachment" standard applicable here. If Boruchowitz's opinion is read more liberally as requiring appointment "as soon as [reasonably] possible," *see id.*, it only begs the original question of what delay is reasonable. The County's motion to exclude these opinions on the ultimate question at issue is GRANTED.

Boruchowitz's opinions regarding section 27706 consist solely of legal analysis "akin to a supplemental brief" and thus do not constitute admissible opinion evidence. *See Williams*, 2011 WL 2200631, at *15; *see also Hangarter*, 373 F.3d at 1016. The County's motion is GRANTED to exclude those opinions as evidence. Because, as discussed below, the Court declines to exercise jurisdiction over Plaintiffs' claim under that statute, the Court need not decide whether it would be more appropriate to consider Boruchowitz's analysis of section 27706 as supplemental argument or to disregard it entirely.

The Court also excludes and disregards the portions of Boruchowitz's report addressing case law interpreting the Sixth Amendment. *See, e.g.*, Boruchowitz Report ¶¶ 46–48 (block-quoting case law from the United States Supreme Court and an 1883 decision of a New York state court). If Plaintiffs wanted Boruchowitz to present legal arguments, they could have retained him as counsel rather than as an expert, or requested that he file an amicus brief on behalf of himself or one of the indigent defense organizations with which he works. Such arguments fall outside of Boruchowitz's role as an expert witness.

This order assumes for the sake of argument that all of the other evidence to which the County objects is admissible. The Court agrees with the County, however, that statements by Lipetzky do not constitute binding judicial admissions on behalf of the County, nor are her or any other witness's personal opinions as to what the Sixth Amendment requires in this context relevant

42

to the Court's interpretation of the law.

**B.    Legal Standard for Summary Judgment Under Rule 56**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## C. Plaintiffs' Claim Under § 1983 and the Sixth Amendment

Both parties seek summary judgment on Plaintiffs' claim under 42 U.S.C. § 1983 that the County failed to honor their right to counsel under the Sixth Amendment of the United States Constitution. The parties agree that the Ninth Circuit's *Oviatt* decision describes the appropriate framework for a claim for failure to act to preserve a constitutional right. That case held that a plaintiff bringing such a claim under § 1983 "must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt*, 954 F.2d at 1474 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)). The analysis here both begins and ends with the first element: whether Plaintiffs were deprived of a constitutional right.

### 1. The Sixth Amendment and *Rothgery*

The Sixth Amendment provides in relevant part that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court addressed "attachment" of the right to counsel in *Rothgery* as follows:

> The Sixth Amendment right of the "accused" to assistance of counsel in "all criminal prosecutions" is limited by its terms: "it does not attach until a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); see also *Moran v. Burbine*, 475 U.S. 412, 430 (1986). We have, for purposes of the right to counsel, pegged commencement to "'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion)). The rule is not "mere formalism," but a recognition of the point at which "the government has committed itself to prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby*, *supra*, at 689.

*Rothgery*, 554 U.S. at 198. The Court went on to hold in that case that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty

is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel," reversing a decision by the Fifth Circuit that the right had not attached because no prosecutor was aware of or involved with the plaintiff's first court appearance. *Id.* at 213.

Formally, the Supreme Court resolved only the question of whether the right had attached, and declined to "decide whether the 6-month delay in appointment of counsel resulted in prejudice to Rothgery's Sixth Amendment rights" or "what standards should apply in deciding this." *Id.* The Court hinted at the answer to that question, however, by stating that "counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Id.* at 212.

### 2. Legal Standard for Unreasonable Delay

As noted above, the Ninth Circuit instructed this Court to consider the question of whether the County provided counsel within a reasonable time after attachment as stated in *Rothgery*, which does not require Plaintiffs to show "actual prejudice." *Farrow*, 637 F. App'x at 988–89. Plaintiffs' surviving Sixth Amendment claim is limited to that issue. *See* Apr. 2017 Order at 21– 27. With the exception of one district court that used a standard of actual prejudice inconsistent with the Ninth Circuit's instructions here, this Court is not aware of any decision articulating a standard by which to evaluate reasonableness of delay. *See id.* at 26 (discussing *Grogen v. Gautreaux*, No. 12-0039-BAJ-DLD, 2012 U.S. Dist. LEXIS 120411, at *9–11 (M.D. La. July 11, 2012), *report and recommendation adopted*, 2012 U.S. Dist LEXIS 120404 (M.D. La. Aug. 24, 2012)).

The language that the Supreme Court and Ninth Circuit used to describe the requirement for timely appointment rules out possibilities of how to apply the standard that fall at both extremes of the potential significance of attachment. First, and contrary to Plaintiffs' arguments and their expert's personal view of the right to counsel, *Rothgery* cannot be understood as requiring counsel to be appointed *at* an indigent defendant's first court appearance, because the decision specifically provides for "a reasonable time *after* attachment," and also holds that the right attaches at such an appearance. 554 U.S. at 212–13 (emphasis added). Thus, except where a

45

defendant's first appearance is itself a critical stage requiring representation, or arises after such a critical stage, at least some time between the first appearance and the appointment of counsel is constitutionally permissible. Second, and contrary to the County's arguments here, the majority opinion's framing of the issue as "a reasonable time *after attachment*," rather than "before a critical stage," precludes a framework that looks *only* to the timing of appointment with respect to upcoming criminal stages. *See id.* (emphasis added); *cf. id.* at 218 (Alito, J., concurring) ("Texas counties need only appoint counsel as far in advance of trial, and as far in advance of any pretrial 'critical stage,' as necessary to guarantee effective assistance at trial."). Although the majority opinion's phrasing explicitly recognizes the importance of adequate representation at critical stages, it also requires some evaluation of whether the period of time between attachment and appointment is reasonable. Both of these conclusions are bolstered by the Ninth Circuit's instruction for this Court to consider "*how soon after the Sixth Amendment right attaches must counsel be appointed*, . . . at what point does delay become constitutionally significant," and "whether the delay in appointing counsel was unreasonable." *Farrow*, 637 F. App'x at 988 (emphasis added).[15]

In its previous order, this Court indicated that it would look to "the totality of the circumstances" to determine whether delay in providing counsel was constitutionally unreasonable, taking into account "the time needed to prepare for an upcoming critical stage," but not limiting the analysis to that factor. Apr. 2017 Order at 27. The Court is not persuaded that

---

[15] Affording due respect to, on one hand, Justice Alito, and on the other, Professor Boruchowitz, the majority opinion's "reasonable time after attachment" language could be understood as dicta in light of the Court's statement that its "narrow" holding was limited to the issue of whether the right had attached and that the Court therefore had "no occasion to consider what standards should apply in deciding" whether a delay in appointment of counsel actually violated the Sixth Amendment. *Rothgery*, 554 U.S. at 213. Outside of the context of this case, one could perhaps reasonably argue that the language on which this order focuses is not binding, and either that the time between attachment and appointment of counsel is not in itself significant (and the appropriate metric is instead solely the time between appointment and a critical stage) or that appointment is required at the time of attachment. Taking into account the Ninth Circuit's instructions remanding this case, however, this Court has no occasion to reconsider whether the phrase at issue in *Rothgery* would in itself constitute binding precedent. *See Farrow*, 637 F. App'x at 988 (stating that the "remaining question is whether Lipetzky appointed counsel within a 'reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself,'" and instructing this Court to consider Plaintiffs' claim in that context).

46

any alteration of that framework is warranted.

### 3. Plaintiffs Have Not Presented Evidence Sufficient to Establish a Violation Based on a Facially Unconstitutional Policy or Deliberate Indifference

Plaintiffs argue that the Court need not and should not consider the particular circumstances of their individual experiences to find a violation of their rights under the Sixth Amendment based on the County's policy of failing to provide counsel at criminal defendants' first court appearances. The record presented here does not support such a finding.

As a starting point, the Court declines to accept Plaintiffs' invitation to set a per se rule as to how much time after attachment is presumptively reasonable. *See* Pls.' Reply at 19–20 (asking the Court to hold that "arrangements for provision of counsel should [presumptively] occur within 48 hours of arrest, and that counsel should [presumptively] be provided at the first court appearance"). Plaintiffs cite no authority for the proposal that "arrangements for provision of counsel" must begin before the right to counsel attaches. As previously discussed and as determined by the court of appeals, the right to counsel only attached at Wade and Farrow's first appearances. Moreover, as discussed above, the Court construes *Rothgery* as foreclosing a rule that counsel must be provided at the first appearance under the circumstances presented here. Finally, the record in this case is not amenable to crafting the kind of rule Plaintiffs seek. It is true that courts have, in some circumstances, fashioned rules to protect constitutional rights that incorporate clear time periods. *See, e.g.*, *McLaughlin*, 500 U.S. at 56–57 (establishing a presumptive time limit of forty-eight hours for probable cause determinations after warrantless arrests). If Plaintiffs wish for this Court to derive from the "reasonable time" standard endorsed by the Supreme Court and Ninth Circuit a hard rule that, under the Sixth Amendment, counsel must always be appointed within a fixed amount of time after attachment—or that some fixed period is presumptively reasonable or unreasonable absent a showing to the contrary—they have not presented the sort of evidence that would allow the Court to do so. Derived from the federal Constitution, such a rule would presumably apply nationwide, in jurisdictions with a wide range of resources, caseloads, and current practices.

Boruchowitz's report, to the extent that it complies with *Daubert*, identifies a number of

47

ways that delay in appointing counsel can potentially harm an indigent defendant. That there is some risk of such harm is not controversial—the Supreme Court recognized as much in *Rothgery*: "a defendant subject to accusation after initial appearance is headed for trial and needs to get a lawyer working, whether to attempt to avoid that trial or to be ready with a defense when the trial date arrives." 554 U.S. at 210. For the most part, Boruchowitz does not tie the risks that he identifies to a particular period of delay, and Coker focuses his opinions on the particular circumstances of Plaintiffs' cases rather than considerations affecting a typical case. The evidentiary record before the Court therefore provides no basis to determine how much time a generic, competent public defender's office (or other system for appointing counsel) would need to provide a defendant with an attorney—or in other words *how much delay is reasonable*, and thus tolerable, under the Constitution in a typical case.

The record that Plaintiffs have presented also does not show that the Public Defender's Office employed an inherently unconstitutional policy in delaying appointment of counsel.

With the possible exception of the 1984 letter regarding arrangements at a particular courthouse where neither Farrow nor Wade appeared—a letter of which Lipetzky was not aware before this litigation, and for which there is no evidence that those arrangements continued in force even at that courthouse through the time of Plaintiffs' prosecutions—Plaintiffs cite no evidence of a policy to withhold representation for any particular period of multiple days. While there is some evidence regarding typical periods *between court appearances*, the only evidence cited regarding the timing of *representation* indicates that the Public Defender's Office received referrals from the court "sometime between" the two court dates, Baker Decl. Ex. D (Lipetzky Dep.) at 44:21–23, or as stated in Lipetzky's declaration, the next business day after the first appearance, Lipetzky Decl. ¶ 3, and defendants waited "up to"—i.e., at most—"two weeks in custody . . . to be represented by an attorney," Martin Decl. Ex. 1 (Lipetzky Dep.) at 030, 64:2–12. The record also indicates that the Public Defender's Office initiated contact with criminal defendants before the second court appearance. Martin Decl. Ex. 1 at 037 (excerpt from the Public Defender's Office website stating that "a paralegal, law clerk or attorney" would interview defendants in custody "before the next court date"); *see also* Baker Decl. Ex. C (Requests for

48

Admissions) ¶ 7 (indicating that a staff member met with Farrow the next business day after his first court appearance, which was nine days before his second appearance); Lipetzky Decl. ¶ 6 (same).

Plaintiffs cite no evidence that, as a matter of course, the County "appoint[ed] counsel five to thirteen days and 'sometimes longer' after the right attaches." *Cf. Farrow*, 637 F. App'x at 988–89 (instructing this Court to consider at the pleading stage whether Plaintiffs' allegation that the County utilized such a test stated a claim for unreasonable delay under *Rothgery*). Aside from their own individual experiences, Plaintiffs have not presented evidence that such a policy exists, and cannot prevail on the basis that a hypothetical policy would violate the Sixth Amendment.[16]

The only policy actually supported by the record is that counsel was provided "sometime between" the first court appearance and the second court appearance. *See* Baker Decl. Ex. D (Lipetzky Dep.) at 44:21–23. Such a policy—i.e., appointing counsel between attachment of the right and the first critical stage—does not inherently violate *Rothgery*'s requirement that counsel be appointed "within a reasonable time after attachment to allow for adequate representation at any critical stage." *See* 554 U.S. at 212.

Plaintiffs also contend that the County used a policy that allowed for arbitrary periods of delay in appointment of counsel, and that this policy of indifference—rather than, as addressed above, a policy of a particular length of delay—itself violated Plaintiffs' Sixth Amendment right to counsel, regardless of the delay (or lack thereof) that Plaintiffs themselves experienced. *See* Pls' MSJ at 18–20. In making that argument, Plaintiffs implicitly disregard the first element of the *Oviatt* test—that Plaintiffs were deprived of a right—by assuming that demonstrating a policy of indifference to the right to timely provision of counsel would in itself suffice to show that they were deprived of a constitutional right.

---

[16] Even if Plaintiffs had established the existence of such a policy, the record is not conducive to determining its reasonableness, for much the same reasons that, as discussed above, this record would not allow the Court to develop a per se rule of how much time is permissible. The lack of evidence regarding broad topics like, for example, logistical challenges to appointing counsel, processes for resolving conflicts and caseload constraints, and accepted practices and timelines in other jurisdictions would still leave the finder of fact without sufficient facts to justify a conclusion that the policy, on its face, was constitutionally unreasonable.

1    Plaintiffs rely on cases considering the right to due process, citing *Oviatt*'s examination of

2    whether a jail had sufficient internal procedure to track whether inmates' liberty interests

3    established by Oregon law were sufficiently protected, and the Supreme Court's decision in *Carey*

4    *v. Piphus*, 435 U.S. 247 (1978), which held that even students whose suspensions were justified

5    and who suffered no other actual injury were deprived of their procedural due process rights as a

6    result of constitutionally defective procedures and thus entitled to nominal damages. *See Carey*,

7    435 U.S. at 266; *Oviatt*, 954 F.2d at 1473–76; Pls.' Mot. at 19–20 (citing *Carey*); Pls.' Opp'n to

8    MSJ at 11–12 (discussing *Oviatt*).  In those cases, however, the defendants' indifference, lack of

9    safeguards, or defective procedures were themselves components of the deprivation of a right

10    because the right at issue was a *right to process*.  Here, the Plaintiffs' surviving constitutional

11    claim is for the right to counsel, and specifically the right to appointment of counsel within a

12    reasonable time after attachment.  *See Farrow*, 637 F. App'x at 987 (affirming dismissal of

13    Plaintiffs' due process claims); Apr. 2017 Order at 27–28 (allowing Plaintiffs' *Rothgery* Sixth

14    Amendment claim to proceed).  Plaintiffs have not presented authority for the proposition that a

15    criminal defendant who is in fact provided counsel within a reasonable period of time after

16    attachment nevertheless suffers a deprivation under the Sixth Amendment if the process by which

17    counsel is provided lacks safeguards to ensure timeliness.[17]

18    Accordingly, on the record before the Court, Plaintiffs cannot prevail based on a per se rule

19    of when counsel should be appointed, a theory of systemic deficiency based on a generally

20    applicable policy of delay, or a theory that deliberate inaction or indifference itself violates the

21    Sixth Amendment without need to consider the specific circumstances of Plaintiffs' own

22    appointment of counsel.

23

24    [17] Even if this case included a due process claim, which in its present form it does not, it is not at
all clear that the Due Process Clause would govern the process by which counsel is appointed.

25    The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or
property without due process of law."  U.S. Const. amend. XIV.  While indigent criminal

26    defendants certainly have a right under the Sixth Amendment to timely appointment of counsel,
Plaintiffs have not argued that indigent defendants have a liberty or property interest in timely

27    appointment such that an inadequate procedure in determining the time of appointment would
effect a constitutional deprivation in itself under the Due Process Clause, even if counsel was

28    timely appointed within the meaning of the Sixth Amendment.

### 4. Plaintiffs' Individual Experiences

Without establishing a per se rule of how long a delay is permissible or showing that the County subjected Plaintiffs to an inherently impermissible policy, Plaintiffs could of course still prevail by showing that the particular delays that they each experienced were constitutionally unreasonable under the totality of the circumstances, *see* Apr. 2017 Order at 27, and that the County is liable under *Monell* and *Oviatt* for its deliberate failure to prevent such unreasonable delays. To meet *Oviatt*'s first element of deprivation of a constitutional right, Plaintiffs must show that the County in fact did not provide them with counsel within a reasonable time after attachment.

That is not to say, however, that the County can rely on circumstances after counsel was appointed to show, post hoc, that the time of appointment was reasonable because it did not actually affect Plaintiffs' ability to defend themselves in the criminal proceedings against them. Although *Rothgery*'s "reasonable time after attachment" requirement has not yet been subject to significant analysis in the courts, the concept of reasonableness more generally is a familiar one, and does not generally include the benefit of hindsight. *See, e.g.*, *Premo v. Moore*, 562 U.S. 115, 132 (2011) (considering the reasonableness of counsel's conduct in the context of a *Strickland* ineffective assistance claim, and holding that "hindsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed"); *Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding in the context of the Fourth Amendment that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); *Zebley v. Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 457–58 (8th Cir. 2010) (holding that a district court correctly stated the standard for negligence under North Dakota law when it instructed jurors that they should not consider hindsight in determining how a reasonable person exercising ordinary care would have behaved). Moreover, to engage in post hoc analysis of how the delay affected Farrow and Wade would run afoul of the Ninth Circuit's admonition that Plaintiffs need not show actual prejudice. In the context of *Rothgery*, the appropriate test is therefore whether counsel was provided within a period of time after attachment that was reasonable under the

circumstances of a defendant's case, as such circumstances were apparent at the time of attachment and during the intervening period before counsel was provided. The Court declines to consider developments in Plaintiffs' cases that occurred, or circumstances that only became clear, after Martin was assigned and agreed to represent them.

There is some dispute as to whether it is appropriate to take into account considerations that are not directly related to the fairness of the criminal trial, such as the potential effects of confinement on a criminal defendant's employment or child custody, among other risks identified in Boruchowitz's report. The County cites *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006), for the proposition that the right to counsel is limited to the purpose of ensuring a fair trial, and that the only relevant potential for prejudice would be the potential for an unfair trial. *See* Reply Re Mot. to Exclude at 3. The passage on which the County relies, however, describes "the right to *effective* assistance of counsel," which the Supreme Court originally derived from the Due Process Clause and later recognized as also arising from "the Sixth Amendment's purpose of ensuring a fair trial." *Gonzalez-Lopez*, 548 U.S. at 146–47 (emphasis added). The Court contrasted that right with the "right to select counsel of one's choice," which "has been regarded as the root meaning of the constitutional guarantee," and which requires no showing of prejudice to establish a violation of a defendant's right under the Sixth Amendment. *Id.* at 147–480. As discussed in this Court's previous order, this Court construes the right to timely appointment of *any* counsel as distinct from the right to *effective* counsel. *See* Apr. 2017 Order at 25 ("Moreover, it is not clear that the same standards apply to a case involving delayed appointment of counsel, like this case, as would apply to cases involving ineffective assistance of counsel, as in *Strickland* and *Cronic*."); *see also Hurell-Harring v. State*, 15 N.Y.3d 8, 22 (2010) (holding that allegations that "counsel was simply not provided at critical stages of the proceedings . . . state[d] a claim, not for ineffective assistance under *Strickland*, but for basic denial of the right to counsel under *Gideon*"). Because it does not affect the conclusion that the County is entitled to summary judgment, the Court assumes for the sake of argument that considerations aside from the fairness of trial are relevant to whether counsel was appointed within a reasonable period of time after attachment

Having addressed the framework to apply and the sort of considerations that are relevant, the Court turns to whether the delays that Plaintiffs experienced were reasonable.

a.  Time Allowed to Prepare for a Critical Stage

As a starting point, with respect to the only factor specifically identified by the Supreme Court in *Rothgery*, the time allowed after appointment for counsel to prepare for upcoming critical stages in Plaintiffs' cases does not suggest that the delay was unreasonable.  The Ninth Circuit affirmed this Court's determination, based on allegations that do not differ significantly from the evidence in the record as to this issue, that Plaintiffs' first appearances were not critical stages, but that their second appearances for "further arraignment" were critical stages.  *Farrow*, 637 F. App'x at 988.  The question as to this factor, then, is whether the timing of appointment reasonably allowed for adequate representation at the second appearances.  *See id.* (quoting *Rothgery*, 554 U.S. at 212).  Asked how much time a lawyer needs to prepare for arraignment, Boruchowitz testified that a lawyer appointed in advance "should spend a good hour meeting with the client before you do anything," and if "appointed right there in the courtroom, you try to take as much time as the judge will give you."  Martin Opp'n Decl. Ex. 12 (Boruchowitz Dep.) at 28:7–16.

Martin was assigned to Farrow's case one day before Farrow's second appearance for arraignment and to Wade's case three days before Wade's second appearance for arraignment.  Baker Decl. Ex. F (Martin Dep.) at 9:25–10:6, 31:23–33:5; Martin Supp'l Decl Ex. 4 at 162 & Ex. 5 at 167.  That timing allowed for the sort of preparation that Boruchowitz testified is appropriate, and there is no other evidence in the record suggesting that more time would be necessary for an attorney to provide adequate representation at an arraignment.  Moreover, it is difficult to see how appointment one or more days before a defendant's arraignment could be construed as providing inadequate time to prepare when appointing counsel *at* a first appearance that includes arraignment—the process that Plaintiffs seek to require, which the County has in large part adopted in the years since this case was filed, and which is widely used in other jurisdictions— provides less time for counsel to prepare than was available in either Plaintiff's case.  There is also no evidence that Martin believed he had insufficient time to prepare for Plaintiffs' second

appearances. The factor of sufficient time to prepare for a critical stage therefore weighs against finding the delay unreasonable for either Plaintiff.

The next question is whether evidence in the record pertaining to other relevant factors would nevertheless require the conclusion that the delay in appointment for either Plaintiff was unreasonable (as Plaintiffs assert) or reasonable (as the County asserts) based on the totality of the circumstances. The Court examines each Plaintiff's circumstances separately, beginning with Wade.

b.   Other Factors Relevant in Wade's Case

Wade, one of five codefendants, first appeared in court on Monday, November 14, 2011, and his right to counsel therefore attached. Martin Supp'l Decl. Ex. 5 at 165; Lipetzky Decl. ¶ 9. The Public Defender's Office determined that it had a conflict three days later on November 17. Lipetzky Decl. ¶ 9 & Ex. D. The Alternate Defender's Office determined that it also had a conflict the following day, November 18, and the case was referred to the conflicts panel and assigned to Martin that same day. *Id.* ¶ 9 & Ex. E; Baker Decl. Ex. F (Martin Dep.) at 31:23–33:5. Martin began working on the case that day—four days after Wade's right to counsel attached. *See id.* at 37:16–39:4; Baker Decl. Ex. R.

Coker, an experienced public defender who before his retirement was in charge of the San Diego County Public Defender's Office, states in his report that "the fact that attorney Martin's assignment to represent Wade in this complex and serious five-defendant case occurred only four days after Wade's initial court appearance seems quite reasonable under all these circumstances and entirely consistent with diligent efforts to arrange for counsel." Martin Decl. Ex. 3 at 126 ¶ 16. Although Boruchowitz—who is also an experienced public defender—identifies a number of generic risks inherent in delayed provision of counsel that would tend to weigh against the reasonableness of any delay, his report and testimony do not address how much time is reasonable to resolve conflicts of interest in a case with several codefendants, and thus do not refute Coker's opinion on that issue. *See* Martin Decl. Ex. 2 at 094–97, 101–04 ¶¶ 15.1–15.13, 37–48. Nor is the Court persuaded that the fact that the County's more recent practice under the ACER program (which devotes more resources to provide counsel at first appearances) calls for resolving conflicts

within "not more than two days," Lipetzky Decl. ¶ 15, creates a material factual dispute. The possibility of faster appointment does not contradict Coker's conclusion that the four-day conflicts process in Wade's case was reasonable. Followed to its logical conclusion, a rule that reasonableness requires that all *possible* efforts and resources must be devoted to minimizing delay in provision of counsel would essentially require appointment at all defendants' first appearances—an outcome that, as discussed above, is not consistent with the law of the case or with *Rothgery*'s allowance of a reasonable delay.

Even assuming for the sake of argument that the delay in appointing counsel allowed charges to be added against Wade that would not otherwise have been permitted without leave of the court, and that the delay affected his school principal's recollection of his interrogation to his detriment, there is no evidence aside from Coker's opinion as to how much time is reasonable for a public defender's office to resolve conflicts of interest in a case like Wade's. Because Coker's opinion on that issue is undisputed, and taking into account the fact that there is no evidence that the delay left counsel with insufficient time to prepare for a critical stage, no rational finder of fact could conclude on this record that the four-day delay in Wade's case was unreasonable. The County's motion for summary judgment is therefore GRANTED as to Wade's Sixth Amendment claim, and Plaintiffs' motion is DENIED as to that claim.

### c. Other Factors Relevant in Farrow's Case

Farrow's case presents a closer call, because there is essentially no evidence in the record explaining a reason for the longer delay of twelve days between attachment of his right to counsel and Martin's assignment to represent him. The Public Defender's Office determined that appointment from the conflicts panel was necessary in light of its excessive caseload, but neither Coker nor Boruchowitz addresses the amount of time reasonable to arrange for such appointment. Coker's speculation that the Labor Day holiday weekend might have led to more criminal cases than usual does not appear to be based on any evidence, and regardless, does not explain why appointment of conflict counsel in such circumstances should take twelve days. *See* Martin Decl. Ex. 3 at 127 ¶ 18.

The totality of the circumstances, however, is not limited to merely the length of the delay.

In Farrow's case, the Public Defender's Office dispatched a paralegal to meet with Farrow and inquire about his case on the next business day after his first court appearance, which, due to the long weekend, was four calendar days later. Lipetzky Decl. ¶ 6. The paralegal completed a report of the interview on a form that included sections for medical or psychiatric history, bail information or "general comments," and case notes "re case progress, problems, settlement," among other topics. Lipetzky Decl. Ex. B. According to Lipetzky, "[n]either the referral packet itself nor the interview with Mr. Farrow disclosed any urgent issues pertaining to Mr. Farrow or the charges that had to be addressed in advance of" the next appearance. Lipetzky Decl. ¶ 6. Coker's report states his opinion that "[t]his interview process would have identified, but did not, any matter in Farrow's criminal case requiring immediate attention." Martin Decl. Ex. 3 at 127 ¶ 20. Lipetzky states in her declaration that in cases where the paralegal interview identified such issues, the Public Defender's Office "would take steps to address these immediate needs." Lipetzky Decl. ¶ 4.[18]

Boruchowitz's report generally identifies potential harms that could result from delayed appointment of counsel because of issues that counsel would recognize and might redress if appointed sooner. *See* Martin Decl. Ex. 2 at 094–97, 101–04 ¶¶ 15.1–15.13, 37–48. Boruchowitz's report does not, however, address whether a paralegal could identify those issues, and thus does not rebut Coker's conclusion that the paralegal who interviewed Farrow would have identified any such issues if they had applied to Farrow. As for whether the paralegal interview was itself unreasonably delayed, if the Court accepts the premise (based on the Supreme Court's formulation of the rule in *Rothgery*) that some delay is permissible, Boruchowitz's report does not provide a standard to evaluate how much delay is reasonable, and Plaintiffs do not identify other evidence in the record to support a conclusion that meeting with a defendant on the next business day after attachment of the right to counsel is unreasonable, particularly where the next court

---

[18] Plaintiffs assert that there is no evidence that the Public Defender's Office actually took such steps. Pls.' Opp'n to MSJ at 13. Plaintiffs do not, however, identify any evidence contradicting Lipetzky's statement, and in the absence of contrary evidence there is no reason to conclude that Lipetzky's declaration under penalty of perjury about the procedure that her office followed is not accurate.

appearance is not imminent, and where the Public Defender's Office generally did not receive referrals from the Superior Court until that next business day, *see* Lipetzky Decl. ¶ 3.

The evidence that the paralegal interview would have revealed any issues requiring attention before the second appearance, and that it in fact revealed no such issues, is uncontroverted. The evidence also shows, as discussed above, that Martin was appointed with enough time to prepare for the first critical stage of Farrow's case. Taking into account all of the facts and circumstances of Farrow's case, no reasonable finder of fact could conclude on this record that the twelve-day delay in appointing counsel in that case was constitutionally unreasonable. The County's motion for summary judgment is therefore GRANTED as to Farrow's Sixth Amendment claim, and Plaintiffs' motion for summary judgment is DENIED as to this claim.

* * *

Because the Court concludes that a rational finder of fact could not find on this record that provision of counsel to Farrow and Wade was unreasonably delayed for the purpose of the Sixth Amendment, the Court does not reach the parties' remaining arguments regarding the Sixth Amendment claim, including whether Farrow is collaterally estopped from bringing such a claim and whether the practices at issue violated the Sixth Amendment rights of potential class members other than the current Plaintiffs. Without evidence to support the conclusion that Plaintiffs' own Sixth Amendment rights were violated, Plaintiffs cannot represent a class of other individuals on their claims that the County's practices violated the rights of putative class members. In any event, the Court does not decide whether the rights of the non-party putative class members were violated, as no class has been certified. Although Plaintiffs' own Sixth Amendment claims are dismissed with prejudice, the claims of other members of the putative class are not before the Court, and this order does not bar any person other than Wade and Farrow from bringing such a claim.

### D.    Plaintiffs' Claim Under California Government Code Section 27706

Plaintiffs' remaining claim under section 27706 of the California Government Code is a state law claim that falls within this Court's subject matter jurisdiction, if at all, under the doctrine

57

of supplemental jurisdiction codified by 28 U.S.C. § 1367(a). Under subsection (c) of that statute, however, a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if," among other reasons, "the claim raises a novel or complex issue of State law" or "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

This case raises what appear to be novel issues of how quickly section 27706 requires a public defender to provide representation upon request or appointment, whether and how ethical conflicts affect that inquiry, and whether a referral of a plaintiff's request for counsel by a court to a public defender's office triggers the public defender's obligations under section 27706 as either a direct request by the plaintiff for representation by the public defender or an appointment of the public defender by the court. Plaintiffs present no argument in their briefs why this case warrants a deviation from the usual approach of declining to exercise state law claims after all federal claims have been dismissed. The Court therefore GRANTS the County's request and dismisses Plaintiffs' section 27706 for lack of subject matter jurisdiction, without prejudice to Plaintiffs bringing that claim in a court of competent jurisdiction.

## IV.    CONCLUSION

For the reasons discussed above, the Court concludes that a reasonable finder of fact could not find that the delay in providing counsel after Plaintiffs' first appearances in their criminal cases was constitutionally unreasonable. To be clear, in reaching this determination, the Court considers only what conclusions can be drawn from the record available, and does not purport to hold that a four- or twelve-day delay is presumptively reasonable, or that an interview by a paralegal before counsel is appointed can necessarily substitute under the Sixth Amendment for providing an attorney. Based on the evidence presented in this case, however, Plaintiff's motion for summary judgment is DENIED, the County's motion for summary judgment is GRANTED as to Plaintiffs' claim under 42 U.S.C. § 1983 and the Sixth Amendment, and Plaintiffs' claim under

58

California Government Code section 27706 is DISMISSED for lack of subject matter jurisdiction, without prejudice to Plaintiffs bringing that claim in a court of competent jurisdiction. The Clerk is instructed to enter judgment accordingly and to close the file.

Because the claims of the putative class are not before the Court, this order does not bar absent putative class members from bringing any claim in a separate action.

**IT IS SO ORDERED.**

Dated: January 2, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge